IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CIVIX-DDI, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NATIONAL ASSOCIATION OF REALTORS, | ) | No. 05 C 6869 |
| HOMESTORE, INC., HOTELS.COM, L.P. , | ) | |
| HOTELS.COM GP LLC, YAHOO! INC., | ) | |
| ORBITZ LLC, TRAVELOCITY.COM INC., | ) | |
| TRAVELOCITY.COM, LP, and | ) | |
| YELLOWPAGES.COM LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Before the Court is Defendant Yahoo! Inc.'s ("Yahoo!") Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c). In its motion, Yahoo! argues that Plaintiff CIVIX-DII, LLC's ("Civix") patent infringement claims are barred because the Yahoo! activities at issue fall within the scope of Civix's convenant-not-to-sue arising from the Civix-Navteq settlement agreement (the "Navteq Agreement"). Because genuine issues of material fact exist as to which, if any, of Yahoo!'s accused activities relate in any way to "NAVTECH Technology" under the Navteq Agreement, the Court denies Yahoo!'s motion.

## BACKGROUND

### I. Parties

Civix is a Colorado limited liability company with its principal place of business at 125 South Wacker Drive, Chicago, Illinois. (R. 104-1; Def.'s Rule 56.1 Stmt. Facts ¶ 1.) Civix owns patents in the field of location-based searching and mapping and licenses its patents to

third parties.  (*Id.* ¶ 17; R. 147-1, Pl.'s Resp. Def.'s Stmt. Facts ¶ 17.)  Yahoo! is a Delaware

corporation with its principal place of business at 701 First Avenue, Sunnyvale, California.

(Def.'s Stmt. Facts ¶ 2.)  Yahoo! offers a variety of services, including Yahoo! Maps, Yahoo!

Yellow Pages, Yahoo! Local, Yahoo! Travel, and Yahoo! Farechase.  (*Id.* ¶¶ 8-12.)

## II.     Patents-in-Suit

Civix is the exclusive owner of U.S. Patent Nos. 6,385,622 (the "'622 patent"), 6,408,307

(the "'307 patent"), 6,415,291 (the "'291 patent"), and 6,473,692 (the "'692 patent").  (R. 203-1;

Pl.'s Second Am. Compl. ¶¶ 11, 13.)  In January 2006, Civix brought this lawsuit against Yahoo!

alleging that Yahoo! Maps, Yahoo! Yellow Pages, Yahoo! Local, Yahoo! Travel, and Yahoo!

Farechase Services infringed various claims of the patents-in-suit.  (Def.'s Stmt. Facts ¶ 3.)

Specifically, Civix alleges infringement of claims 6, 12-20, 25, 26, 28, 29, 31, 38, 42-45, 47, 55,

56, 61, and 63 of the '622 patent, claims 13-15, 17, 19, 25, and 30 of the '307 patent, claims 5-7,

14, 21, and 23 of the '291 patent, and claims 27, 28, 30, 31, 41, 42, 44, 45, and 50 of the '692

patent.  (Pl.'s Second Am. Compl. ¶ 24.)

## III.    Navteq Litigation and Settlement Agreement

Navteq, formerly known as NavTech, gathers, formats, and licenses geographic data to

numerous companies.  (Def.'s Stmt. Facts ¶ 15.)  In 1999, Civix sued Navteq in the United

States District Court for the Northern District of Illinois for patent infringement.  (*Id.* ¶ 19.)

Civix and Navteq settled the lawsuit in 2000.  (*Id.* ¶ 20.)  Under the integrated settlement

agreement (the "Navteq Agreement"), Civix granted "a worldwide, irrevocable, unlimited,

unrestricted, paid-up license under the CIVIX Patents and the INTERFERENCE Patents to the

NAVTECH GROUP to engage in any Commercial Activity at its sole discretion involving or

relating in any way to NAVTECH Technology." (*Id.* ¶¶ 21, 22; Def.'s Confidential Ex. 2,

Navteq Agreement, ¶ 6.a.)  The Navteq Agreement contains a covenant-not-to-sue, stating in

relevant part:

> 9.    <u>COVENANTS NOT TO SUE</u>
>
> a.     CIVIX hereby covenants and agrees, on a worldwide and irrevocable basis, that neither CIVIX, nor any successor or assign of CIVIX, nor any successor or assign or licensee of the CIVIX Patents and/or the INTERFERENCE Patents, will ever bring any claim, demand and/or cause of action of any kind against:
>
> i.     any NAVTECH COMPANY with respect to or in any way relating to the NAVTECH Technology, including without limitation any Commercial Activity by any NAVTECH COMPANY or any third party on behalf of any NAVTECH COMPANY.
>
> ii.    any direct or indirect customer or end user of a NAVTECH COMPANY, and/or of any NAVTECH Technology, with respect to or in any way relating to the NAVTECH Technology, including without limitation any Commercial Activity by any such customer or end user relating in any way to (1) all or any part of the NAVTECH Technology or (2) any products, processes, systems, and/or services that use and /or incorporate all or any part of the NAVTECH Technology.

(*Id.* ¶ 21; Navteq Agreement, ¶ 9.)

The Navteq Agreement defines a "NAVTECH COMPANY" as "any and all entities that

form all or a part of NAVTECH; and/or its direct and indirect subsidiaries, affiliates, joint

ventures, and partnerships; and/or distributors, agents, and representatives thereof."  (*Id.* ¶ 27,

Navteq Agreement, ¶ 1.h.)  Further, the Navteq Agreement defines "Commercial Activity" as

"making, using, selling, offering for sale and/or importing and any and all other activity,

including without limitation creation, development, manufacture, manufacture by another,

licensing, offer to license, disposition, transfer, distribution, advertising, promotion, and/or

exportation."  (*Id.* ¶ 25, Navteq Agreement, ¶ 1.d.)  The Navteq Agreement also defines

"NAVTECH Technology" as:

> . . . any past, present, and/or future invention, product, process, system, and/or service (including, but not limited to, information, data, software and hardware) (1) created, developed, made, used, sold, offered for sale, licensed, offered for license, imported

and/or exported by any NAVTECH COMPANY; and/or (2) created for, developed for, made for, and/or purchased by any NAVTECH COMPANY; and/or (3) licensed by any entity to any NAVTECH COMPANY. Without limiting the foregoing in any way, NAVTECH Technology expressly includes any database of any NAVTECH COMPANY, purchased by any NAVTECH COMPANY, and/or licensed to any NAVTECH COMPANY, such as a geographic database including information about business, historical and other sites and/or points of interest.

(Navteq Agreement, ¶ 1.j.)

**IV.     Sublicense Agreement between Navteq and Yahoo!**

Yahoo has licensed geographic data from Navteq since 2001.  (Def.'s Stmt. Facts ¶ 33.)

Relevant language of the Navteq–Yahoo! License Agreement ("Navteq Sublicense Agreement")

includes:

> 4.1 License:   Subject to LICENSEE's performance of its obligations under this Agreement, NT hereby grants LICENSEE with respect to each Territory License a non-exclusive, worldwide, non-transferable (except as set forth in Section 3.1 (Successors and Assigns)), non-sublicensable (except as may expressly be provided in the Territory License) license under NT's Intellectual Property rights to use the NAVTECH Data solely as further specified as the "Use Rights" in such Territory License and solely for the term and Licensed Territory and in the Application(s) specified in such Territory License.

(Def.'s Confidential Ex.1, Data License Agreement, at 2 (*as amended by* Def.'s Confidential

Ex.1, Addendum 4, at 3).)

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P 56(c).  A genuine issue of material fact exists only if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202

(1986).  The party seeking summary judgment has the burden of establishing the lack of any

genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548,

2552, 91 L. Ed. 2d 265 (1986).  In determining whether a genuine issue of material fact exists,

the Court construes the facts in a light most favorable to the non-moving party and draws all

reasonable inferences in favor of that party.  *Anderson v. Liberty Lobby*, Inc., 477 U.S. at 255.

The existence of a factual dispute is not sufficient to defeat a summary judgment motion, instead

the non-moving party must present definite, competent evidence to rebut the summary judgment

motion.  *Butts v. Aurora Health Care, Inc.*, 387 F. 3d 921, 924 (7th Cir. 2004); *see also* Fed R.

Civ. P. 56(e) (adverse party must set forth specific facts showing genuine issue for trial);*see also*

Fed R. Civ. P. 56(e) (adverse party must set forth specific facts showing that there is a genuine

issue for trial).

<u>**ANALYSIS**</u>

**I.**      **Applicable Law**

**A.**      **Patent License Defense**

Under title 35, Section 154(a)(1), a patent holder has the right to exclude others from

making, using, or selling the patented invention.  *Monstanto Co. v. Scruggs*, 459 F.3d 1328,

1338 (Fed. Cir. 2006).  "[I]ntellectual property rights, like any other property rights, are subject

to the contractual obligations of their owner and the applicable law."  *McCoy v. Mitsuboshi

Cutlery, Inc.*, 67 F.3d 917, 920 (Fed. Cir. 1995).  As such, a patent holder may confer a license

on another party.  *Id.; see also Anton/Bauer, Inc. v. PAG, LTD.*, 329 F.3d 1343, 1350 (Fed. Cir.

2003) ("all or part of a patentee's right to exclude others from making, using, or selling a

patented invention may be waived by granting a license, which may be express or implied").

"Through the license, the patent holder (the licensor) grants certain rights to another party (the

licensee), which amount to an agreement not to sue the licensee for the activities described within the license." *Cook Inc. v. Boston Scientific Corp.,* 208 F.Supp.2d 874, 879 (N.D. Ill. 2002). The party asserting the affirmative defense of a patent license bears the burden of proving its defense. *McCoy*, 67 F.3d at 920. Whether a patent license protects a certain accused activity is a question of contract interpretation. *See Intel Corp. v. VIA Tech., Inc.*, 319 F.3d 1357, 1361-63 (Fed. Cir. 2003).

### B. Illinois Contract Principles[1]

#### 1. Contract Interpretation

Illinois courts adhere to the "four corners rule" of contract interpretation, which provides that "an agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence." *Davis v. G.N. Mortg. Corp.,* 396 F.3d 869, 878 (7th Cir. 2005) (internal quotations omitted) (citing *Air Safety, Inc. v. Teachers Realty Corp.,* 185 Ill.2d 457, 236 Ill.Dec. 8, 706 N.E.2d 882, 884 (1999)). In other words, courts interpret unambiguous contract terms according to their plain meaning. *Utility Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 687 (7th Cir. 2004) (citing *Trade Ctr. v. Dominick's Finer Foods,* 304 Ill.App.3d 931, 238 Ill.Dec. 230, 711 N.E.2d 333, 335 (1999)); *see also PPM Fin., Inc. v. Norandal USA, Inc.,* 392 F.3d 889, 892 (7th Cir. 2004) (if contract provisions' language is clear and unambiguous, court ascertains parties' intent exclusively from contract's language). A contract provision is ambiguous if it is subject to more than one reasonable interpretation. *PPM Fin., Inc.,* 392 F.3d at 893 (citing *Lapham-Hickey Steel*

---

[1] Although the Navteq Agreement does not provide a choice of law clause, the parties do not dispute that Illinois law governs the Navteq Agreement.

*Corp. v. Prot. Mut. Ins. Co.,* 166 Ill.2d 520, 211 Ill.Dec. 459, 655 N.E.2d 842, 846 (1995)).  In

Illinois, the interpretation of an unambiguous contract is a question of law.  *Utility Audit, Inc.*,

383 F.3d at 687.  Questions of contractual ambiguity, on the other hand, are for the trier of fact

unless the extrinsic evidence bearing on the interpretation is undisputed.  *Casualty Co. v.*

*Northwestern Nat'l Ins. Co.,* 427 F.3d 1038, 1041 (7th Cir. 2005).

### 2.        Third-Party Beneficiaries

"Individuals who are not parties to a contract may enforce its terms only when the

original parties intended the contract to directly benefit them as third parties."  *United States v.*

*Andreas,* 216 F.3d 645, 663 (7th Cir. 2000) (citing Restatement (Second) of Contracts § 304); *see*

*also United Logistics, Inc. v. Catellus Dev. Corp.,* 319 F.3d 921, 930 (7th Cir. 2003) (although

not a party to the contract, an intended third party beneficiary is one who the contracting parties

intended to benefit from the contract).  Under Illinois law, "[i]t is not necessary that the

beneficiary be identified by name in the contract, but it must be identified in some manner, for

example, by describing the class to which it belongs."  *Continental Cas. Co. v. American Nat.*

*Ins. Co.,* 417 F.3d 727, 734-35 (7th Cir. 2005) (citing *Holmes v. Fed. Ins. Co.,* 353 Ill.App.3d

1062, 289 Ill.Dec. 750, 820 N.E.2d 526, 530 (2004)).

## II.        Yahoo!'s License Defense to Patent Infringement

Under the Navteq Agreement, Civix granted a license under the "CIVIX Patents" to the

"NAVTECH GROUP" to engage in any Commercial Activity at its sole discretion involving or

relating in any way to "NAVTECH Technology."  (Def.'s Stmt. Facts ¶ 22; Navteq Agreement ¶

6.a.)  The '622, '307, and '291 patents at issue are continuations of application Serial No.

08/371,425, filed on January 11, 1995, and are therefore included in the definition of "CIVIX

Patents" under the Navteq Agreement.[2]  (Navteq Agreement ¶ 1.a.)  Also under the Navteq

Agreement, Civix released all direct and indirect customers of Navteq from infringement claims

under the "CIVIX Patents" arising prior to the agreement date of January 25, 2000, involving or

relating in any way to "NAVTECH Technology."  (*Id*. ¶ 7.a.ii.)  Civix also agreed not to sue

customers or end users of Navteq with respect to or in any way relating to "NAVTECH

Technology," including "Commercial Activity" of a customer or end user relating in any way to

"NAVTECH Technology," or products, processes, systems, and/or services that use and/or

incorporate all or part of the "NAVTECH Technology."  (*Id*. ¶ 9.a.ii; Def.'s Stmt. Facts ¶ 21.)

### A.    Navteq Agreement Provision at Issue

The release provision in Paragraph 7 of the Navteq Agreement is inapplicable because

Yahoo!'s earliest license agreement with Navteq is after the January 25, 2000, execution date of

the Navteq Agreement.  (Def.'s Stmt. Facts ¶ 33.)  In addition, Yahoo! has not asserted that it is

part of the "NAVTECH GROUP," and thus a patent licensee under Paragraph 6 of the Navteq

Agreement.  Instead, Yahoo! argues that Paragraph 9 of the Navteq Agreement, the covenant-

not-to-sue, protects its accused services in their entirety.  Specifically, Yahoo! relies on the

language in the Navteq Agreement stating that Civix cannot "bring any claim, demand, and/or

causes of action of any kind against . . . ***any direct or indirect customer*** or end user of a

NAVTECH Company, and/or any NAVTECH Technology, with ***respect to or in any way***

***relating to*** the NavTech Technology."  (Navteq Agreement ¶ 9.a.ii; Def.'s Stmt. Facts ¶ 21.)

(emphasis added).  In short, Yahoo! argues that it is a third-party beneficiary to the Navteq

---

[2]  Although the parties did not brief the issue of whether the covenant-not-to-sue in the
Navteq Agreement covers the '692 patent, the Court addressed this issue in a related case
concluding, as a matter of law, that the covenant-not-to-sue also covers the '692 patent.  *CIVIX-
DDI, LLC v. Cellco P'ship*, No. 03 C 3792, 2004 WL 2966928, at *5 (N.D. Ill. Dec. 1, 2004).

Agreement because it is a "direct customer" of a NavTech Company. *See Continental Cas. Co.,* 417 F.3d at 734-35.

The parties do not dispute that the Navteq Agreement is integrated and that it does not reference the Navteq Sublicense Agreement. Under Illinois law, an "integration clause is a 'clear indication that the parties desire the contract be interpreted solely according to the language used in the final agreement.'" *Much v. Pacific Mut. Life Ins. Co.*, 266 F.3d 637, 644 (7th Cir. 2001) (quoting *Air Safety, Inc.*, 185 Ill.2d at 465). Thus, when "parties formally include an integration clause in their contract, they are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence." *Id.* (quoting *Air Safety, Inc.*, 185 Ill.2d at 465.) As such, under basic principles of contract law, the Navteq Sublicense Agreement does not limit Yahoo!'s third-party beneficiary rights under the Navteq Agreement as Civix suggests. *See Liberty Mut. Ins. Co. v. Travelers Indem. Co.*, 78 F.3d 639, 643-44 (D.C. Cir. 1996) (citing Restatement (Second) of Contracts § 309, Defenses Against the Beneficiary, cmt. c.) ("beneficiary's right against the promisor is not subject to claims and defenses of the promisee against the beneficiary unless the contract so provides.").

### B. Civix's Definition of "Use"

The covenant-not-to-sue in the Navteq Agreement covers "any products, processes, systems, and/or services that use and /or incorporate all or any part of the NAVTECH Technology." (Navteq Agreement ¶ 9.a.ii; Def.'s Stmt. Facts ¶ 21.) Despite this unambiguous language, Civix attempts to create an ambiguity in defining the word "use" by incorporating extrinsic evidence. More specifically, Civix relies on the Navteq Sublicense Agreement and a fragment from Navteq's Rule 30(b)(6) witness Thomas C. Birch's deposition testimony, in which Birch testifies about the Navteq Sublicense Agreement.

The Navteq Sublicense Agreement requires Yahoo! to display a NavTech copyright marking on web pages if NavTech Data is used to generate a display on the web page. Specifically, the Sublicense Agreement states that Yahoo! must "conspicuously display [NavTech] Marks and Legends . . . on on-screen displays" and requires that "in all instances where NAVTECH Data is used . . . , [Yahoo!] shall attribute [NAVTECH] as the creator and source of origin of the NAVTECH Data, and shall make commercially reasonable efforts to not in any way be misleading in that regard or misrepresent or imply [that Yahoo!] or any third party is the creator or source of origin of NAVTECH Data." (Def.'s Confidential Ex.1, Data License Agreement, at 6 (as amended by Def.'s Confidential Ex.1, Addendum 4, at 6).) The negative inference of this contractual requirement is that if Yahoo! does not mark the web page, then NavTech Data is not used to generate a display on the web page, and not that NavTech Data is not used **at all** as Civix suggests.

Indeed, the Navteq Sublicense Agreement distinguishes between a transaction and Yahoo!'s marking requirements for the display of the results of a transaction. (*Compare* Data License Agreement, Ex. D, at 13 (defining transactions as types of results derived from NavTech Data) *with* Data License Agreement, Schedule, Territory License No.1, at 1 (describing marking requirements for the display of transactions)). Thus, the Navteq Sublicense Agreement itself discredits Civix's proposed definition of "use" by reference to the markings.

Nevertheless, under the basic tenets of contract interpretation, the Court must interpret the Navteq Agreement's terms according to their plain meaning and will not examine extrinsic evidence if the terms are unambiguous. *See Davis,* 396 F.3d at 878; *Utility Audit,* 383 F.3d at 687. Here, the Navteq Agreement unequivocally states that it covers "any products, processes, systems, and/or services that use and /or incorporate all or any part of the NAVTECH

Technology." (Navteq Agreement ¶ 9.a; Def.'s Stmt. Facts ¶ 21.) Because this provision is not

subject to more than one reasonable interpretation, *see PPM Fin., Inc.,* 392 F.3d at 893, the

Court will not turn to extrinsic evidence – namely, the Birch testimony and the Navteq

Sublicense Agreement – to interpret "use" as Civix suggests. *See Davis,* 396 F.3d at 878. In

sum, Civix's argument based on Yahoo!'s contractual marking obligation fails.

### C.    Actual Use

Next, Civix contends that the scope of the Navteq Agreement is limited to actual use.

The relevant language of the Navteq Agreement in this action states that Civix cannot "bring any

claim, demand, and/or causes of action of any kind against . . . any direct or indirect customer or

end user of a NAVTECH Company, and/or any NAVTECH Technology, ***with respect to or in***

***any way relating to*** the NavTech Technology." (Navteq Agreement ¶ 9.a.ii; Def.'s Stmt. Facts ¶

21.) (emphasis added). Civix offers its own interpretation of this clause based on the Court's

earlier decision in a related case involving the Navteq Agreement. *See CIVIX-DDI, LLC v.*

*Cellco P'ship*, No. 03 C 3792, 2004 WL 2966928, at *5 (N.D. Ill. Dec. 1, 2004). More

specifically, Civix emphasizes a single sentence from the Court's earlier opinion to support an

interpretation that limits the scope of the Navteq Agreement to actual use: "The Court cannot

interpret the covenant not to sue as precluding CIVIX from suing even activities that do not use

'NAVTECH Technology.'" *CIVIX-DDI, LLC v. Cellco P'ship*, 2004 WL 2966928, at *5.

Civix's argument fails to recognize the larger context of the Court's earlier opinion.

In *CIVIX-DDI, LLC v. Cellco P'ship*, the Court rejected defendant Verizon Information

Services' ("VIS") argument that Navteq's license agreement with Civix was a covenant "to

never sue NavTech's indirect customers whether or not the lawsuit targeted "NAVTECH

Technology." *Id.,* 2004 WL 2966928, at *5. While the sentence Civix relies upon was part of

11

the Court's rejection of VIS's argument, the Court further explained the proper focus of the contractual analysis in the next sentence of the opinion: "Thus, to the extent the accused . . . functionality **does not involve or relate** to a NavTech database, the NavTech Agreement's covenant does not preclude CIVIX from bringing suit." *Id.* (emphasis added). The sentence Civix relies upon was not an attempt by the Court to define "involve or relate to." Rather, it was the Court's rejection of VIS's argument that Civix agreed "to never sue NavTech's indirect customers" regardless of the activity at issue. Finally, earlier in the previous *Civix* decision the Court unequivocally stated that the "Navtech Agreement license only covers commercial activity **involving or relating to** 'NAVTECH Technology.'" *Id.* at *4 (emphasis added). Thus, Civix's attempt to narrow the scope of the covenant-not-to-sue based on the Court's earlier decision concerning paragraph 6 – not paragraph 9 – of the Navteq Agreement fails.

## III.   Genuine Issues of Material Fact Exist

### A.   Relevant Contract Provision

As discussed, Yahoo! brings this action pursuant to paragraph 9 of the Navteq Agreement stating that Civix cannot "bring any claim, demand, and/or causes of action of any kind against . . . any direct or indirect customer or end user of a NAVTECH Company, and/or any NAVTECH Technology, **with respect to or in any way relating to** the NavTech Technology." (Navteq Agreement ¶ 9.a.ii.) To address Yahoo!'s argument that the covenant-not-to-sue in the Navteq Agreement bars Civix's patent infringement claims, the Court must determine if there are genuine issues of material fact whether the accused Yahoo! activities relate in any way to "NAVTECH Technology." Civix and Yahoo!, however, disagree on the scope of activities that

relate in any way to NAVTECH Technology.[3] Civix implies that an analysis under the covenant-not-to-sue must be performed individually on 29 separate "functions" within Yahoo! Maps, Yahoo! Local, Yahoo! Yellow Pages, Yahoo! Travel, and Yahoo! Farechase.  (R. 163-1; Pl.'s Resp. to Def.'s Mot. for Summ. J. at 1, 10-13; R. 159-1; O'Neill Decl. at 5-9.)  On the other hand, Yahoo! argues that the analysis under the covenant-not-to-sue must be performed once per "service," in other words, once for each of the aforementioned products.  (R. 103-1; Def.'s Mem. Support Summ. J. at 9-13.)  Civix and Yahoo! offer insufficient arguments to support their respective positions and they do not rebut each other's arguments as to whether the scope of "with respect to or in any way relating" is a "function" within a "service" or an entire "service."

### 1.    Civix's Argument

Civix points to the Navteq Sublicense Agreement in support of its argument that each function must be analyzed individually under the covenant-not-to-sue:

> 4.1 License:  Subject to LICENSEE's performance of its obligations under this Agreement, NT hereby grants LICENSEE with respect to each Territory License a non-exclusive, worldwide, non-transferable (except as set forth in Section 3.1 (Successors and Assigns)), non-sublicensable (except as may expressly be provided in the Territory License) license under NT's Intellectual Property rights to use the NAVTECH Data solely as further specified as the "Use Rights" in such Territory License and solely for the term and Licensed Territory and in the Application(s) specified in such Territory License.

(Def.'s Confidential Ex.1, Data License Agreement, at 2 (*as amended by* Def.'s Confidential Ex.1, Addendum 4, at 3).)  According to Civix, the Navteq Sublicense Agreement only gives Yahoo! rights to use Navteq Data, and, consequently, each function must be analyzed individually to determine if Navteq Data is used.  (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 3-

---

[3]  "'NAVTECH Technology' includes NavTech's database products."  *See CIVIX-DDI, LLC v. Cellco P'ship,* No. 03 C 3792, 2004 WL 2966928, at *4 (N.D. Ill. Dec. 1, 2004).

4.)  This narrow definition is not supported by the Navteq Sublicense Agreement, which defines "use rights" as "using the NAVTECH Data . . . alone or ***associated with*** third party points of interest information and/or graphical icons, together with the Application to create and/or derive information authorized in Exhibit D."  (Def.'s Confidential Ex.1, Territory License No. 1, at 1 (emphasis added).)  Exhibit D contains a broad definition of an "Application," including transactions that may be used to generate authorized information.  (Data License Agreement, Ex. D, at 13.)  Civix's arguments thus do not sufficiently address how the Navteq Sublicense Agreement mandates a "function-by-function" analysis under the terms of the covenant-not-to-sue.

Furthermore, as discussed in detail above, the Navteq Sublicense Agreement does not limit Yahoo!'s third-party beneficiary rights under the Navteq Agreement.  Therefore, the scope of Yahoo!'s rights under the covenant-not-to-sue is defined by the Navteq Agreement, not the Navteq Sublicense Agreement.  The only argument Civix advances on the interpretation of the Navteq Agreement itself is a mischaracterization of the Court's prior holding in *CIVIX-DDI, LLC v. Cellco P'ship*, which the Court rejected above.

### 2.       Yahoo!'s Argument

Meanwhile, Yahoo! argues that the analysis under the covenant-not-to-sue must be performed once per "service," in other words, once for each product at issue, including Yahoo! Maps, Yahoo! Local, Yahoo! Yellow Pages, Yahoo! Travel, and Yahoo! Farechase.  To support this construction, Yahoo! attempts to define each product as a "Commercial Activity" related to Navteq Technology, and hence protected under the covenant-not-to-sue.  In making this argument, Yahoo! equates Yahoo! Maps, Yahoo! Local, Yahoo! Yellow Pages, Yahoo! Travel, and Yahoo! Farechase with "Commercial Activity."  (Def.'s Mem. Support Summ. J., at 11.)

14

This argument fails because the Navteq Agreement defines "Commercial Activity" in terms of actions and not in terms of products, goods, or services. (Def.'s Stmt. Facts ¶ 25, Navteq Agreement, ¶ 1.d.) Further, the parties dispute whether the accused Yahoo! products are "Commercial Activities" under the Navteq Agreement. (R. 192-1; Def.'s Reply to Rule 56.1 Stmt. of Add'l Facts at ¶ 26.)

Moreover, Yahoo! does not argue that Yahoo! Maps, Yahoo! Local, Yahoo! Yellow Pages, Yahoo! Travel, and Yahoo! Farechase are each indivisible "products, processes, systems, and/or services that use and/or incorporate all or any part of the NAVTECH Technology." (Navteq Agreement, ¶ 9.a.ii.2.) Instead, Yahoo! argues that if each of its products consist of multiple separate services, the multiple services relate to each other. In other words, "even if these non-NAVTEQ-based functions are deemed separate services, they still 'relat[e] in any way to . . . services that use and/or incorporate all or any part of the NAVTECH Technology.'" (Def.'s Mot. for Summ. J. at 12 (quoting Navteq Agreement, ¶ 9.a.ii.2).) Under this argument, one service that incorporates Navteq Technology relates to all other services within the same product, and thus all services within a product are covered under the covenant-not-to-sue. Despite Yahoo!'s argument, there is no textual support in paragraph 9 of the Navteq Agreement that Yahoo! services relate in any way to other services in the same product.

## B. Federal Circuit Court Guidance

A recent Federal Circuit decision lends guidance in determining the scope of protection afforded to a third-party beneficiary under a covenant-not-to sue. *See Jacobs v. Nintendo of Am., Inc.* 370 F.3d 1097, 1098-99 (Fed. Cir. 2004). In *Jacobs,* the patent owner sued Analog Devices, a manufacturer of accelerometers, for patent infringement. *Id.* at 1098-99. The parties settled and executed a covenant-not-to-sue. *Id.* The patent owner then sued Nintendo, Analog Devices'

customer, for patent infringement, based on its use of Analog Devices' accelerometer product in its game controllers. *Id.* at 1099. The Federal Circuit rejected the patent owner's argument that Analog Devices contracted for a covenant-not-to-sue that left its customers completely unprotected against infringement suits, or alternatively, unable to use the infringing functionality contained within the accelerometer product. *Id.* at 1101-02. Specifically, the Federal Circuit held that the contract language weighed against the proposed interpretation which would "render the right commercially worthless." *Id.* (internal citation omitted).

In *Jacobs*, the Federal Court easily identified Analog Devices' intent when agreeing to the covenant-not-to-sue with the patent owner because the product at issue was a hardware accelerometer device with clearly defined functionality. As the *Jacobs* court noted "it is unlikely that Analog would have contracted for the right to manufacture and sell a product knowing that its customers would be unable to use the product that it sold them for the bargained-for purpose." *Id.* at 1101.

Here, determining the parties' intent under the Navteq Agreement is more difficult because Navteq Technology can be packaged or bundled with other data and application software to create products that may not have been anticipated by either Navteq or Civix. While *Jacobs* supports the proposition that there is, at least, a minimum set of potential uses of the Navteq Technology that are covered under the covenant-not-to-sue, it cannot be used to support the broadest possible contractual interpretation asserted by Yahoo! – that entire Yahoo! products may be covered under the covenant-not-to-sue if Navteq Technology is incorporated in any way. Simply put, there are narrower interpretations of the scope of the covenant-not-to-sue that do not render the rights bargained for "commercially worthless." *Id.* at 1101-02.

### C. Relevant Contract Provision is Ambiguous

Consequently, the Court is faced with the parties' insufficient arguments that do not assist in determining whether the scope of "with respect to or in any way relating to the NavTech Technology" is a "function" within a "service" or an entire "service." Without convincing, developed arguments why each interpretation is reasonable or the other's interpretation is unreasonable, the term "with respect to or in any way relating to the NavTech Technology" is ambiguous because it is susceptible to more than one reasonable interpretation. *See PPM Fin., Inc.,* 392 F.3d at 893. Because the parties have ignored critical contextual factors and the Court cannot interpret the parties' intent based on the contract's plain language or undisputed extrinsic evidence, the scope of "with respect to or in any way relating to the NavTech Technology" appears to be a question for the jury. *See In re Comdisco, Inc.*, 434 F.3d 963, 968 (7th Cir. 2006); *Casualty Co.,* 427 F.3d at 1041 (questions of contractual ambiguity are for the trier of fact). At minimum, the Court cannot determine the scope of "with respect to or in any way relating to the NavTech Technology" on the record before it.

As such, there are genuine issues of material fact whether all of the accused Yahoo! activities are covered under the covenant-not-to-sue. For purposes of illustration, the Court identifies at least four examples where there is a genuine issue of material fact whether an accused Yahoo! activity relates in any way to Navteq Technology.

### D. Illustrations of Genuine Issues of Material Fact

#### 1. User Search for a City Name in Yahoo! Maps

For purposes of its summary judgment motion, Yahoo! does not dispute that the Navteq Database does not contain geocoding information for city names. (Def.'s Reply Stmt. Add'l Facts ¶ 23.) Further, the declaration of Jeremy Kreitler, Product Manager for Yahoo! Maps,

describes the operation of Yahoo! Maps when a street address is entered, but does not describe its operation when the user merely enters a city name. (Def.'s Confidential Ex. 3, Kreitler Decl. ¶¶ 14-23.) Accordingly, when a user enters a city name into Yahoo! Maps, there is a genuine issue of material fact whether the Navteq Database is accessed. If Yahoo! Maps does not access the Navteq Database when the user enters a city name request, then whether Yahoo! Maps utilizes Navteq Data depends on user input. Because Yahoo! Maps accepts both city name and street address requests, some users may operate Yahoo! Maps without accessing Navteq Data. Whether these city name request transactions relate in any way Navteq Data is a genuine issue of material fact because responding to city name requests in Yahoo! Maps could be interpreted as a separate "function" under the covenant-not-to-sue.

## 2. Sequence of Displayed Web Pages in Yahoo! Yellow Pages

A search on Yahoo! Yellow Pages for businesses near a user-specified address returns a list of businesses and Navteq Data in the form of distances between the user-specified address and the returned businesses. (Kreitler Decl. ¶ 57; R. 97-1; Def.'s Non-Confidential Ex. H.) Kreitler describes a sequence of two user mouse clicks to navigate from the results page to the next web page containing a map generated with Navteq Data. (Kreitler Decl. ¶ 58; Def.'s Non-Confidential Ex. I.) The intermediate web page returned by the first user mouse click is a TeleAtlas/GDT map. (R. 143-1, Pl.'s Stmt. Add'l Facts ¶ 27.) This map is returned by clicking on a "map" link from the results page. Yahoo! does not dispute that the initial map returned from Yahoo! Yellow Pages will always be a TeleAtlas/GDT map. (Def.'s Reply Stmt. Add'l Facts ¶ 27.) Yahoo!, however, contends that subsequent maps containing Navteq Data are returned by user mouse clicks on the "interactive map" or "driving directions" links on the intermediate web page. (*Id.*; Kreitler Decl. ¶ 58.)

Accordingly, there is a genuine issue of material fact whether the generation of the intermediate web page containing a TeleAtlas/GDT map relies in any way on Navteq Data. Specifically, each returned web page in Yahoo! Yellow Pages requires a separate user action – a user address input generates a results web page and subsequent user mouse clicks are needed to navigate to additional web pages. If the intermediate web page is generated without the use of Navteq Data, whether the intermediate web page relates in any way to Navteq Data is a genuine issue of material fact because the generation of the intermediate web page in response to a user mouse click could be interpreted as a separate "function" under the covenant-not-to-sue.

### 3. Satellite Images Displayed by Yahoo! Maps Beta and Yahoo! Farechase

For purposes of this summary judgment motion, Yahoo! does not dispute that Yahoo! Maps Beta and Yahoo! Farechase display satellite images that do not come from Navteq. (Def.'s Reply Stmt. Add'l Facts ¶ 33.) Yahoo!, however, utilizes Navteq Data to overlay geocoded address points on the displayed satellite images. (R. 184-1; Def.'s Supp. Confidential Ex. 2, Kreitler Dep. at 125; Kreitler Decl. ¶¶ 37-45.) Users of Yahoo! Maps Beta or Yahoo! Farechase can also choose to view a map utilizing Navteq Data instead of a satellite image by navigating to a separate web page. (Kreitler Decl. ¶¶ 19, 35, 65.) In other words, a user of Yahoo! Maps Beta or Yahoo! Farechase can request a web page containing a map utilizing Navteq Data or a web page containing a satellite image with overlaid address information.

Whether a displayed satellite image relates in any way to Navteq Data is a genuine issue of material fact because a displaying satellite image, in and of itself, could be interpreted as a separate "function" under the covenant-not-to-sue. One alternative interpretation is that the "function" at issue is generating an entire web page in response to a user request and the satellite

19

image and geocoded address points based on Navteq Data are components of the returned web page and relate to each other.  Another alternative interpretation is that displayed satellite images relate to maps utilizing Navteq Data displayed on separate web pages within Yahoo! Maps Beta or Yahoo! Farechase.

### 4. Street Address Information for Points of Interest in Yahoo! Local, Yahoo! Yellow Pages, and Yahoo! Maps

Yahoo! does not dispute that Yahoo! Local, Yahoo! Yellow Pages, and Yahoo! Maps generally do not use Navteq Data as a source for street address information for points of interest. (Def.'s Reply Stmt. Add'l Facts ¶ 33.)  Nevertheless, in response to a user request, the street address information for points of interest is displayed on the same web page as information derived from Navteq Data, such as distances from an address to the points of interest or geocoded versions of the points of interest overlaid on a map.  (Def.'s Non-Confidential Ex. G, H.)  Whether displayed address information for points of interest relates in any way to Navteq Data is a genuine issue of material fact because displaying address information for points of interest, in and of itself, could be interpreted as a separate "function" under the covenant-not-to-sue.  An alternative interpretation is that the "function" at issue is generating an entire web page in response to a user request, and the address information for points of interest and overlaid geocoded address points (or other information derived from based on Navteq Data) are components of the returned web page and relate to each other.

## <u>CONCLUSION</u>

For the reasons discussed above, the Court denies Yahoo!'s Motion for Summary

Judgment.

**Dated:** November 6, 2006

**ENTERED**

**AMY J. ST. EVE**
**United States District Court Judge**