**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| **CIVIX-DDI, LLC,**<br><br>                        **Plaintiff,**<br><br>          **v.**<br><br>**HOTELS.COM, L.P. and HOTELS.COM<br>GP, LLC,**<br><br>                   **Defendants.** | Case No.:     05 C 6869<br><br>Judge Amy St. Eve |

**HOTELS.COM'S REPLY IN SUPPORT OF ITS
<u>OMNIBUS MOTION FOR SUMMARY JUDGMENT</u>**

**REDACTED -- PUBLIC VERSION**

June 24, 2011

# TABLE OF CONTENTS

I.     **CIVIX CANNOT PROVE HOTELS.COM INFRINGES THE '291 PATENT.** ..................................................................................... 2

    A.    Hotels.com cannot infringe the '291 patent because it does not "store" any "advertising information." ...................................................... 2

    B.    Hotels.com cannot infringe the '291 patent because it does not "supply" any "advertising information." ..................................................... 2

    C.    Hotels.com cannot infringe the '291 patent without third-party participation ............. 3

II.    **CIVIX CANNOT PROVE HOTELS.COM "MAKES" OR "USES" THE "PORT" CLAIMED IN THE '622 PATENT OR THAT HOTELS.COM IS LIABLE FOR THOSE WHO DO.** ................................................ 5

III.    **CIVIX CANNOT PROVE ANY INITIAL SCREEN SEARCH INTERFACE OF THE ACCUSED SITES INFRINGES THE '622 PATENT.** ............................. 7

    A.    The accused initial screen search interface does not infringe the "associated category"/"selected category" limitations of the '622 patent. ......................................... 7

    B.    CIVIX cannot prove that any accused initial screen search interface induces infringement of the '622 patent. ......................................... 11

IV.    **CIVIX CANNOT PROVE HOTELS.COM INFRINGES THE "VIDEO" ELEMENTS OF THE ASSERTED CLAIMS.** ........................................ 12

    A.    Hotels.com cannot infringe the '291 patent because it has not "stored" any "video clips." ................................................................... 13

    B.    Hotels.com has not infringed claim 20 of the '622 patent because its "database" never stored any "video." ............................................ 14

V.    **CIVIX IGNORES THE RELEVANT WILLFULNESS STANDARD AND CANNOT PROVE WILLFUL INFRINGEMENT.** ................................. 14

VI.    **CONCLUSION** ................................................................................ 15

# TABLE OF AUTHORITIES

## Cases

*Abraxis Bioscience, Inc. v. Mayne Pharma (USA) Inc.,*
   467 F.3d 1370 (Fed. Cir. 2006) ................................................................. 3, 12, 15

*ACCO Brands, Inc. v. ABA Locks Mfrs. Co., Ltd.,*
   501 F.3d 1307 (Fed. Cir. 2007) ....................................................................... 13

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.,*
   637 F.3d 1324 (Fed. Cir. 2011) ......................................................................... 9

*Amhil Enters. Ltd. v. Wawa, Inc.,*
   81 F.3d 1554 (Fed. Cir. 1996) ......................................................................... 15

*Black & Decker (U.S.), Inc. v. Home Prod. Mktg., Inc.,*
   929 F.Supp. 1114 (N.D. Ill. 1996) .................................................................. 14

*Black & Decker, Inc. v. Robert Bosch Tool Corp.,*
   260 Fed. Appx. 284 (Fed. Cir. 2008) .............................................................. 17

*Centillion Data Sys., LLC v. Quest Comm'ns Int'l, Inc.,*
   631 F.3d 1279 (Fed. Cir. 2011) ................................................................. 6, 7, 8

*Desenberg v. Google, Inc.,*
   392 Fed. Appx. 868 (Fed. Cir. 2010) ................................................................ 5

*Dynacore Holdings Corp. v. U.S. Phillips Corp.,*
   363 F.3d 1263 (Fed. Cir. 2004) ....................................................................... 11

*Exigent Tech., Inc. v. Atrana Solutions, Inc.,*
   442 F.3d 1301 (Fed. Cir. 2006) ......................................................................... 1

*Global-Tech Appliances, Inc. et al., v. SEB S.A.,*
   2011 U.S. LEXIS 4022 (Sup. Ct. May 31, 2011) ............................................ 14

*Int'l Visual Corp. v. Crown Metal Mfg. Co.,*
   991 F.2d 758 (Fed. Cir. 1993) ........................................................................... 4

*Intellect Wireless, Inc. v. T-Mobile USA, Inc.,*
   735 F. Supp. 2d 928 (N.D. Ill. 2010) ................................................................ 5

*Knorr-Bremse System Fuer Nutzfahrzeuge GmbH v. Dana Corp.,*
   383 F.3d 1337 (Fed. Cir. 2004) ....................................................................... 17

*Moleculon Research Corp. v. CBS, Inc.,*
   793 F.2d 1261 (Fed. Cir. 1986) ....................................................................... 13

*MyMail, Ltd. v. Am. Online, Inc.*,
476 F.3d 1372 n.1 (Fed. Cir. 2007) ........................................................................10

*Novartis Corp. v. Ben Venue Labs., Inc.*,
271 F.3d 1043 (Fed. Cir. 2001) ..............................................................................3

*Oak Indus., Inc. v. Zenith Elecs. Corp.*,
726 F. Supp. 1525 (N.D. Ill. 1989) ........................................................................14

*Rehncol v. Don Best Sports*,
548 F. Supp.2d 356 (E.D. Tex. 2008) ....................................................................13

*Renishaw PLC v. Marposs Societa per Anzioni*,
158 F.3d 1243 (Fed. Cir. 1999) ..............................................................................4

*Rowe Int'l Corp. v. Ecast, Inc.*,
586 F. Supp. 2d 924 (N.D. Ill. 2008) ......................................................................2

*SiRF Tech., Inc. v. ITC*,
601 F.3d 1319 (Fed. Cir. 2010) ..............................................................................5

*Spectralytics, Inc. v. Cordis Corp.*,
2011 WL 2307402 (Fed. Cir. June 13, 2011) .......................................................17

*Superguide Corp. v. DirecTV Enters.*,
358 F.3d 870 (Fed. Cir. 2004) ..............................................................................16

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011) .....................................................................6, 7, 16, 17

*Uniloc USA, Inc. v. Microsoft Corp.*,
640 F. Supp. 2d 150 (D.R.I. 2009) ..........................................................................7

*Viscase Cos. v. World Pac Int'l AG*,
714 F. Supp. 2d 878 (N.D.Ill. 2010) ......................................................................4

*Vita-Mix Corp. v. Basic Holding, Inc.*,
581 F.3d 1317 (Fed. Cir. 2009) ............................................................................13

**Statutes**

35 U.S.C. §271(a) ..........................................................................................................6

There is no need for any trial here as CIVIX cannot sustain its infringement burden, and summary judgment should appropriately dispose of this matter in full. CIVIX cannot establish, *inter alia*, that Hotels.com stores and supplies accused "advertising information" and "video clips," as required by claim 23 of the '291 patent. Nor can it prove that Hotels.com infringes either patent-in-suit without the participation of others. And CIVIX cannot demonstrate that the initial screen search interface of the accused sites — the only search service CIVIX has properly accused — includes any "category" limitation, as required by the '622 asserted claims. CIVIX's inability to marshal admissible evidence to support any possible jury verdict in its favor now forecloses its case. *See, e.g., Exigent Tech., Inc. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1308-09 (Fed. Cir. 2006) (affirming summary judgment of non-infringement, noting "nothing more is required than the filing of a summary judgment motion stating that the patentee had no evidence of infringement and pointing to the specific ways in which accused systems did not meet the claim limitations").

In opposition, CIVIX tacitly concedes its shortcomings by resorting to distraction: blaming Hotels.com for CIVIX's evidentiary and discovery failings (D.I. 688 ("Opp.") at 8-9); misconstruing applicable law and sidestepping the record (*id.* at 19-21); and most glaringly, proffering new, untimely, and threadbare infringement allegations to somehow establish that "Hotels' [*sic*] motion for summary judgment is limited." *Id.* at 3-4, 6-8, 10. To that end, CIVIX even submits, inappropriately, an expert declaration nearly as long as its only Rule 26 infringement report, attempting to re-write deposition testimony and introduce infringement theories well beyond the proper scope of this matter.[1] These sideshows cannot permit CIVIX's baseless claims to survive to trial, as the controlling law and facts of record plainly warrant summary judgment disposition.

---

[1] CIVIX's untimely attempt at expert supplementation to prolong this matter is all the more prejudicial since "the purpose of the discovery deadlines set by the Court was to have the evidence — including expert evidence, on which both sides rely heavily — exchanged well in advance of both the summary judgment deadline and the trial date, so that the parties would know where they stood on the issues." *Rowe Int'l Corp. v. Ecast, Inc.*, 586 F. Supp. 2d 924, 935 (N.D. Ill. 2008); *see also* Hotels.com's Response to CIVIX's SAF, filed herewith, at n 2.

## I. CIVIX CANNOT PROVE HOTELS.COM INFRINGES THE '291 PATENT.

### A. Hotels.com cannot infringe the '291 patent because it does not "store" any "advertising information."

Dispositively, CIVIX cannot demonstrate that any "advertising information" it accuses of satisfying claim 23 is "stored" by Hotels.com.  SUF ¶¶72-74, 29 (claim 23 requires "storing information about the items of interest in a database").  Even in opposition, CIVIX identifies no Hotels.com database that has ever stored advertising. ██████████████████████████████ ████████████████████████████████████████████. SUF ¶¶75-77.  But CIVIX has never accused that third-party (or any other) ad provider of jointly infringing with Hotels.com (SUF ¶15), instead alleging only that "all of the claimed steps of claim 23 of the '291 patent must be … performed by Hotels.com."  Opp. at 15.  Accordingly, as CIVIX's own expert admits, Hotels.com does not infringe the claim, and summary judgment is appropriate.  SUF ¶74 (agreeing that "if Hotels.com does not have an advertisement in its database, there's no infringement of this claim").

### B. Hotels.com cannot infringe the '291 patent because it does not "supply" any "advertising information."

Regardless of whether Hotels.com "stores" advertising, for which no proof exists, it plainly does not "supply" advertising "about at least one of the items of interest to one of a plurality of ports."  SUF ¶¶29, 76-77. ████████████████████████████████████████████ ████████████████ SUF ¶76. ████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ Opp. at 22-23. ████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████ *Id.*; *Abraxis Bioscience, Inc. v. Mayne Pharma (USA) Inc.*, 467 F.3d 1370, 1378 (Fed. Cir. 2006) ("Literal infringement requires that each and every claim limitation be present").

### C.  Hotels.com cannot infringe the '291 patent without third-party participation.

To avoid the law that forecloses its joint infringement claim, CIVIX now seeks to abandon it outright, arguing that Hotels.com infringes claim 23 by itself.  *Compare* SUF ¶15 (alleging joint infringement) *with* Opp. at 15-18.  But CIVIX cannot prove Hotels.com's infringement by focusing entirely on the language of claim 23, as it does.  *Id.*  Tellingly, CIVIX cites nothing to confirm that Hotels.com can and does — by itself and without third-party participation — perform each step of the claimed method.  *Id.*  CIVIX's failure to substantiate its infringement theory with actual evidence should dispose of it.  *See, e.g., Novartis Corp. v. Ben Venue Labs., Inc.,* 271 F.3d 1043, 1050-51 (Fed. Cir. 2001) ("Under modern summary judgment law, a patentee who fails to provide probative evidence of infringement runs the risk of being peremptorily nonsuited.")  Moreover, CIVIX's infringement theory cannot survive summary judgment, as Hotels.com cannot infringe claim 23 by itself, because the "supplying" step of claim 23 necessarily requires the participation of third-party users of the accused sites.

Critically, the "supplying" step of claim 23 requires "inputs at the one port," which dictate what and when information is correspondingly supplied.  SUF ¶29.  CIVIX has not explained how, let alone demonstrated that, Hotels.com has ever provided "inputs" at any port.  Nor can it, as CIVIX's only coherent allegation is based on third-party users entering information into their own computer "ports."  SUF ¶¶32, 34.  CIVIX admits these third-party individuals access the accused sites of their own volition and not at Hotels.com's direction.  SUF ¶¶36-38.  If anything, their "inputs at the one port" initiate and are part of the process CIVIX accuses.  As CIVIX's expert admits, if these individuals never executed a search on the accused site, Hotels.com could not "supply" information, as the claim requires.  SUF ¶34.

Additionally, the "supplying" step cannot be satisfied by Hotels.com alone since, by itself, Hotels.com is incapable of allowing "a user at the port [to] locate the one item of interest."  SUF

¶29.  CIVIX tries to read out this limitation by emphasizing a ruling from another matter, not binding on Hotels.com.  Opp. at 2, 18; D.I. 650 at 6.  But contrary to CIVIX's misstatements, this Court has never held that provision is "not a limitation" to claim 23.  *Compare* Opp. at 18 with D.I. 691-8.  Rather, it "must provide the capability for a user at a port to locate the one item of interest."  *Id.*  CIVIX ignores its own prosecution statements that to provide this capability at a port, "the item and its spatial details including the geographic position is downloaded from a remote database through the Internet."  SUF ¶¶30-31.  In fact, this predicate — that a personal computer port "fetch" or download data from the remote database — was one reason claim 23 was allowed by the USPTO.  *Id.*  CIVIX cannot avoid those prosecution statements now.[2]  *See, e.g., Desenberg v. Google, Inc.*, 392 Fed. Appx. 868, 870-71 (Fed. Cir. 2010) (dismissing infringement claim on joint infringement grounds because patentee, during prosecution, implicated need for third-party action).

This case is unlike those relied on by CIVIX, where "user" action was unclaimed or peripheral to claimed steps.  Unlike *SiRF Technology, Inc. v. ITC*, where the accused infringer "perform[ed] the step of communicating/transmitting … because [it] initiate[d] the process of transmitting and communicating," here, the third-party human "user" that initiates the "supplying" limitation.  601 F.3d 1319, 1330 (Fed. Cir. 2010); D.I. 650 at 2 ("user" means "a human being").  CIVIX's machine tool analogy is likewise misplaced (Opp. at 16), as claim 23 expressly conditions the "supplying" step on "inputs at the one port" being received each and every time the method is performed.  *Cf. SiRF*, 601 F.3d at 1331 (reasoning that the accused infringer performed the "processing" and "representing" steps, because they were "automatically" performed after a one-time

---

[2]  The cases CIVIX cites in response are inapposite.  Opp. at 18-19.  *See Intel Corp. v. ITC*, 946 F.2d 821, 832 (Fed. Cir. 1991) (discussing infringing capability of apparatus claim, not method claim at issue here); *Int'l Visual Corp. v. Crown Metal Mfg. Co.*, 991 F.2d 768, 771 (Fed. Cir. 1993) (finding that district court misconstrued "housing" term as being "separate and apart" when claim language required it be "integrally connected"); *Renishaw PLC v. Marposs Societa per Anzioni*, 158 F.3d 1243, 1248-49 (Fed. Cir. 1999) ("any interpretation that is provided or disavowed in the prosecution history also shapes the claim scope"); *Viscase Companies v. World Pac Int'l AG*, 714 F. Supp. 2d 878, 884 (N.D.Ill. 2010) (noting that in claim construction, the prosecution history "does not unambiguously support one construction or the other").

4

setup of the user's devices). And, unlike in *Intellect Wireless, Inc. v. T-Mobile USA, Inc.*, claim construction here is complete and CIVIX's only articulated theory involves third-party computer "ports." 735 F. Supp. 3d 928, 937-39 (N.D. Ill. 2010) (holding summary judgment was premature and noting "a factual question exists as to whether the defendants alone perform the steps in the claims at issue, or whether conduct by the subscribers is also necessary").

## II. CIVIX CANNOT PROVE HOTELS.COM "MAKES" OR "USES" THE "PORT" CLAIMED IN THE '622 PATENT OR THAT HOTELS.COM IS LIABLE FOR THOSE WHO DO.

In opposition, CIVIX does not deny that the computer "port" accused of infringing the '622 patent claims is never supplied, made, or put into service by Hotels.com. Opp. at 19-22. CIVIX concedes, as it must, that the claimed "port" is not satisfied by any Hotels.com computer, but rather, in its expert's words, by the "computers and web-enabled devices" of third-party users who visit the accused sites at their discretion. SUF ¶35. And CIVIX admits that these third-parties are not under the direction or control of Hotels.com. SUF ¶¶36-38. Accordingly, as a matter of law, Hotels.com does not "make" or "use" the accused system pursuant to 35 U.S.C. §271(a). *See, e.g., Centillion Data Sys., LLC v. Quest Comm'ns Int'l, Inc.*, 631 F.3d 1279, 1286-1288 (Fed. Cir. 2011).

To marginalize these concessions, CIVIX resorts to misdirection, asserting that *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292 (Fed. Cir. 2011), controls the inquiry. Opp. at 20 (arguing that "the 'port' claim element is the same as … the 'remote registration station' in *Uniloc*"). CIVIX is wrong, however, as the claim in *Uniloc* did not recite a "port" limitation or any comparable "terminal … from which a user of the invention can access the database." *Compare* D.I. 642 (stipulated construction of "port") *with Uniloc*, 632 F.3d at 1309 (claiming a "remote registration station" to deter unlicensed software copying). While the accused system in *Uniloc* functioned with third-party computers, those devices did not satisfy any limitation of the asserted *Uniloc* claim, unlike the accused third-party personal computer "ports" here. Thus, this is not a case like *Uniloc*, where "other

parties are necessary to complete the environment in which the claimed element functions" (*id.*), but rather one, as alleged by CIVIX here, where third-parties are necessary to <u>meet claimed elements</u>. *See, e.g., Centillion*, 631 F.3d at 1286-1288.

CIVIX's attempts to analogize the "remote registration station" of *Uniloc* to the "port" at issue here also fail. Contrary to CIVIX's gross misstatement that *Uniloc's* "remote registration station" was "supplied by individual users" (Opp. at 20), it was the accused infringer in *Uniloc*, Microsoft, that made and put into service the accused remote registration station. 632 F.3d at 1309 ("here, only one party, Microsoft, makes or uses the remote registration station"). Unlike the third-party "ports" accused here — computers that Hotels.com neither owns, employs, nor operates — the accused infringer Microsoft controlled and maintained the accused "remote registration station" at its Redmond, Washington facility. *See Uniloc USA, Inc. v. Microsoft Corp.*, 640 F. Supp. 2d 150, 157-158 (D.R.I. 2009) (contrasting the "Microsoft Clearinghouse (Remote Registration Station)" with "User (Local)" elements); *id.* at 162 ("there can be little doubt Microsoft makes, uses and controls the Clearinghouse server"). Thus, even if the *Uniloc* claim was comparable to the '622 patent claims, which it is not, CIVIX's purported analogy between third-party users' personal computer "ports" and Microsoft's "remote registration station" fails.

CIVIX's attempt to sidestep the precedent that actually controls — *Centillion* — notably lacks any pin citation and is unavailing. Opp. at p. 21. The front-end user interface and back-end processing dichotomy inherent in CIVIX's asserted '622 patent claims and its infringement theory — as previously acknowledged by its own expert (SUF ¶¶26-28) — is entirely parallel to the *Centillion* claims. *See, e.g., Centillion*, 631 F.3d at 1281 ("the claim includes both a 'back-end' system maintained by the service provider (claim elements 1, 2, and 3) and a 'front-end' system maintained by an end user (claim element 4)"). As a matter of law, Hotels.com cannot "make" the claimed

system ("combine all of the claim elements"), under CIVIX's contention that computers supplied by third-parties satisfy the "port" element.  SUF ¶35; *Centillion*, 631 F.3d 1287-88.

Nor can CIVIX avoid *Centillion* by invoking an erroneous legal standard for "using" a claimed system.  Opp. at 21-22.  The relevant "use" question, as clarified by *Centillion*, is who "put[s] the invention into service, i.e., control[s] the system as a whole and obtain[s] benefit from it."  631 F.3d at 1284.  Because Hotels.com does not put into service the accused third-party computer "ports," it does not "use" the claimed system in an infringing manner.

Moreover, CIVIX's contention that Hotels.com "exercises control" over the port by "[p]roviding a web interface" ignores the plain language of the claims, which expressly recite how the "user" puts into service the claimed system and "port."  Compare Opp. at 21-22 with SUF ¶¶18-19 ("port having a user interface for accepting the inputs" and "port generating the request signal in response to inputs by the user"); see also SUF ¶¶20, 22-23; D.I. 650 at 2 ("user" means "a human being").  Plainly, it is the third-party user, if anyone, who "puts into service" the claimed system by inputting information and generating a request signal.  *See, e.g., Centillion*, 631 F.3d at 1285.

Because Hotels.com neither completes the claimed invention by providing a computer "port," nor puts any system into service, it cannot directly infringe '622 patent claims 20 and 26.  And because Hotels.com "in no way directs its customers," it also does not directly infringe the '622 patent under a joint infringement theory.  SUF ¶¶36-38; *Centillion*, 631 F.3d at 1287-88.

## III.    CIVIX CANNOT PROVE ANY INITIAL SCREEN SEARCH INTERFACE OF THE ACCUSED SITES INFRINGES THE '622 PATENT.

### A.  The accused initial screen search interface does not infringe the "associated category"/"selected category" limitations of the '622 patent.

Unable to deny that the '622 patent claims require an "associated category"/"selected category," CIVIX seeks to prove infringement by draining those key terms of all meaning.  *Compare* Opp. at 5-11 *with* D.I. 650 (*Markman* order) at 9-10 (noting that in a database containing "'hotels,'

'restaurants,' 'music stores,' 'computer products,' 'sporting-goods stores,' and 'jewelry stores,'" a user practices the invention when she, *e.g.*, "command[s] the display of music stores relative to LAX so that they are easily located"). Here, no initial screen search service of any accused site — all that CIVIX has properly accused, and thus the subject of this motion[3] — has ever allowed a user to provide or select any "category" contained in any Hotels.com database. Nor has that service ever generated searches based on any "category" that divides items in any Hotels.com database. Accordingly, there is no infringement. *Id.* (construing the term as "a classification both stored in the database and provided or selected by a user that divides particular items of interest into subgroups").

CIVIX concedes the relevant facts: CIVIX's expert acknowledges that only "property type" and "star rating" have been accused of satisfying the limitation, and it cannot prove that the latter was ever available on any accused initial screen. SUF ¶¶56-57. CIVIX further acknowledges its infringement claim is based not on any user input of "property type," but rather only on a user "enter[ing] a city name." SAF ¶25, SUF ¶48. ██████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ SUF ¶¶63-

---

3    Hotels.com moves on the searching service offered on the initial screen of the accused sites because that is the only service accused by CIVIX's expert in his Rule 26 infringement report, and its infringement is the predicate for CIVIX's entire damages claim. D.I. 682-1 at ¶23; SUF ¶¶49-50.

In opposition, CIVIX raises, for the first time, a number of search functions beyond the initial screen, and hence, outside the scope of this motion. For instance, CIVIX raises the "suites, condos, bed & breakfast" search functionality ██████████████████████████████████████████ Opp. at 3, 6; SAF ¶¶7, 12, 14. Neither that functionality, nor the "Results Page," "Top Destinations," "Top Countries," and "Search Options" functionalities, are available on any initial screen of the accused sites. *Cf.* Opp. at 3-4; SAF ¶¶8-10 *with* SUF ¶¶39, 42 (showing the initial screens at http://www.hotels.com).

CIVIX's contentions regarding these search functions beyond the initial screen are untimely and, regardless, further precluded by the claim. These searches require user inputs over multiple screens, and do not generate a "single electronic representation of a user's selection of at least one category and at least one geographic vicinity," as the parties have stipulated the claims require. SUF ¶53. Indeed, to secure the '622 patent claims in reexamination, CIVIX surrendered multiple-screen search forms as not falling within the claimed "request signal," and it cannot reclaim that matter now with untimely contentions. SUF ¶6; *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1336 (Fed. Cir. 2011) (a patentee "cannot attempt to distance itself from the disavowal of broader claim scope" during reexamination).

64. As such, the "property type" CIVIX accuses is of no consequence to the accused initial screen searches. CIVIX's TV analogy is thus inapt, as the remote control here — the accused initial screen search interface — does not even permit one to change the channel. Opp. at 7.

CIVIX fails in its attempt to square its theory of <u>user inaction</u> with the requirement that a user "provide or select" an "associated category." Opp. at 6-8, 10. First, CIVIX's assertion that non-input by a user is "providing or selecting" renders that limitation meaningless, resurrecting CIVIX's proposed but rejected "category" construction that required no such user input. *See* D.I. 650 at 7-8 (rejecting CIVIX's proposed construction as foreclosed by the written description of the patents); D.I. 679 at 20; *MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1378 n.1 (Fed. Cir. 2007) (affirming summary judgment of non-infringement and concluding that plaintiff's expert's opinion is contradicted by the patent's specification and does not create an issue of fact).

Second, CIVIX proffers no evidence that the "preselected tabs" it contends satisfy the claimed "associated category" actually correspond to any "classification" in a Hotels.com database, as the construction requires. Opp. at 7 ("the Hotels.com website preselects 'hotels' over 'air,' 'suites,' 'vacation packages,' 'deals,' 'destinations' or 'road trips"). These tabs in fact do not, and CIVIX's expert admits to being wholly unable to prove otherwise. SUF ¶69; *see, e.g., Dynacore Holdings Corp. v. U.S. Phillips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir. 2004) ("It is well settled that an expert's unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine issue of material fact, and that a party may not avoid that rule simply by framing the expert's conclusion as an assertion that a particular critical claim limitation is found in the accused device.").

Third, CIVIX has put forth no evidence confirming its assertion that Hotels.com "preselects" the "hotel" property type category for the user. Opp. at 7. Critically, its own expert admits that he "cannot speak with any certainty" as to any "default" property type the accused

searches apply.  SUF ¶67.[4]  And CIVIX concedes that the accused sites never inform the user that "hotels" — as opposed to other property types — is ever "preselected."  SUF ¶62.  Without this information, no user could ever meaningfully "select or provide" a category.

Acknowledging the flaws in its infringement theory, CIVIX proffers a new, but equally fallible, "alternative" in opposition.  Opp. at 7 ("Alternatively, the 'classification' can be hotels in and around a city."), 10.  CIVIX newly contends that a user's input of a location satisfies both "geographic vicinity" and "associated category" claim limitations.  Opp. at 8 ("in entering a city name into the user interface … a user is not selecting a location 'alone'; she is selecting both a location and a property type (i.e., 'hotels')").  Not only should this novel theory be rejected as untimely, which it plainly is, but it too fails to satisfy the claimed "category."

This Court has held that the '622 patent claims a database containing distinct "geographic vicinity" and "associated category" elements for each item of interest.  D.I. 650 at 5 ("'A database stores . . . for each of the items of interest, positional coordinates, a geographic vicinity, and at least one associated category'").  Thus, in addition to location, which satisfies "geographic vicinity" (SUF ¶¶18-19), CIVIX must further identify an "associated category" for each item of interest, *i.e.*, "a classification 'that divides particular items of interest into subgroups.'"  D.I. 650 at 9.  Pointing back to the item's location, as CIVIX now does to satisfy both elements, is insufficient.  *See, e.g., Abraxis Bioscience,* 467 F.3d at 1378 ("Literal infringement requires that each and every claim limitation be present").

Moreover, ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

---

[4]  Recognizing that discovery is over and it cannot satisfy its evidentiary burden, CIVIX now baselessly blames Hotels.com for its discovery failings.  Opp. at 8-9.  To be sure, Hotels.com complied fully with its obligations.  Response to SAF ¶¶ 8; 21.  And, in pointing out that CIVIX cannot satisfy its infringement burden, Hotels.com does not "rely on information it failed to produce during discovery to support summary judgment."  Opp. at 9.



. SUF ¶¶63-64.  The "property type" category CIVIX

accuses thus does not "divide[ ] items of interest into subgroups" in any database, as the "associated

category" construction requires.   D.I. 650 at 10.

.[5]

In construing "associated category," this Court explained that "a user may select an

associated category and so obtain information about a <u>subset</u> of items of interest that are within the

user's geographic vicinity."  D.I. 650 at 9.

— the limitation is not met.

### B.  CIVIX cannot prove that any accused initial screen search interface induces infringement of the '622 patent.

Because CIVIX cannot demonstrate that any accused initial screen search interface directly

infringes the '622 patent (*see supra*), Hotels.com cannot induce infringement of those claims.  *See, e.g.,*

*ACCO Brands, Inc. v. ABA Locks Mfrs. Co., Ltd.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007) ("to prevail on

an inducement claim, the patentee must establish first that there has been direct infringement").[6]

Moreover, the one-input (location) user interface of the accused initial screens demonstrably

contradict and cannot support any inference of intent to encourage infringement of claims explicitly

---

[5]   CIVIX attempts to sidestep this reality by invoking claim language not at issue, noting that "a portion of the information in the database" must be returned to the user.  Opp. at 10.  But the claims further recite that "the transmitted portion of the information includ[e] … at least one of the items of interest within <u>the selected category</u> and geographic vicinity."  For the reasons mentioned above, CIVIX cannot demonstrate that any initial screen search function yields results based on any "selected category."

[6]   For this reason, the cases CIVIX cites are easily distinguished.  *Rehncol v. Don Best Sports*, 548 F. Supp.2d 356, 365 (E.D. Tex. 2008) (finding no summary judgment of inducement because "genuine issue of material fact exists with regard to direct infringement"); *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986) (finding induced infringement where accused product was capable of being directly infringed).

requiring a user interface with two inputs (geographic vicinity and a selected category). *See ,e.g., Vita-Mix Corp. v. Basic Holding, Inc.,* 581 F.3d 1317, 1328-29 (Fed. Cir. 2009) (affirming summary judgment of no induced infringement in part because defendant "could have reasonably believed [its product] was non-infringing").

Nor has CIVIX shown that Hotels.com held the requisite specific intent to induce infringement. As Hotels.com has long maintained, there was no need to change the accused sites following CIVIX's infringement claim, because it believed "the first page that users see when they visit the site" never infringed. *Compare* Opp. at 11, 14-15 *with* Response to SAF ¶28 ("[n]o service . . . receives a 'request signal representative of a selected category and geographic vicinity"). Unlike the inapposite cases CIVIX cites, no allegation of copying exists here.[7] And the notice letters CIVIX makes much of actually base defenses Hotels.com has long maintained and successfully asserted. For example, those letters tout CIVIX's prior settlements with Navigation Technologies (Navteq) and MapQuest, settlements which this Court recognized afforded Hotels.com rights. *See* Opp. Exh. W; D.I. 263 at 13 ("Hotels.com is a third-party beneficiary to the Navteq Agreement"), 26.

## IV. CIVIX CANNOT PROVE HOTELS.COM INFRINGES THE "VIDEO" ELEMENTS OF THE ASSERTED CLAIMS.

CIVIX admits that Hotels.com does not practice the "virtual tour" technology it accuses of satisfying the "video" element of claim 23 of the '291 patent and claim 20 of the '622 patent. SUF ¶¶81-82. Putting aside the question of whether these "virtual tours" are indeed "video," which they are not, ████████████████████████████████████████████

████████████████████████████████████████████████████

---

[7]    *See, e.g., Global-Tech Appliances, Inc. et al., v. SEB S.A.,* No. 10-6, 2011 U.S. LEXIS 4022, at *2, 30 (Sup. Ct. May 31, 2011) (finding inducement when defendant copied "all but the cosmetic features" of the patented embodiment)*; Black & Decker (U.S.), Inc. v. Home Prod. Mktg., Inc.,* 929 F.Supp. 1114, 1121 (N.D. Ill. 1996) (finding inducement when direct infringement was undisputed and defendant admitted to "knowingly cop[ying] the core design used" in the patent); *Oak Indus., Inc. v. Zenith Elecs. Corp.,* 726 F. Supp. 1525, 1542 (N.D. Ill. 1989) (denying summary judgment of no induced infringement because accused infringer was aware of the patent prior to designing infringing product).



SAF ¶46.

*See, e.g., Abraxis*, 467 F.3d at 1378 (Fed. Cir. 2006) ("Literal infringement requires that each and every claim limitation be present"). Summary judgment of no infringement is further appropriate for the reasons below.

**A. Hotels.com cannot infringe the '291 patent because it has not "stored" any "video clips."**

As with the "advertising information" element of claim 23, CIVIX cannot demonstrate that any "video clips" were ever "stored" by Hotels.com. SUF ¶¶92, 29 (claim 23 requires "storing information about the items of interest in a database"). Alleging that only Hotels.com performs "all of the claimed steps of claim 23 of the '291 patent" (Opp. at 15), SUF ¶¶83-84; SAF ¶¶46-47.

Opp. at 23; SAF ¶46; *see, e.g., Amhil Enters. Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1562 (Fed. Cir. 1996) (Literal infringement exists . . . when the properly construed claim reads on the accused device exactly.") SUF ¶¶84, 92.

CIVIX's attempt to salvage claim 23 by rendering its "video clip" element merely optional is a non-starter. CIVIX's expert has already conceded that claim 23 requires the "storage" of video

---

8  To be sure, Expedia is a third-party not named in this litigation and not controlled by Hotels.com. Response to SAF ¶46.

clips. SUF ¶92 ("If Hotels.com did not store video clips in its own database, it wouldn't satisfy the claim, correct? A. Yes."). His reading of the claim is further supported by its plain language and CIVIX's own reexamination representations. SUF ¶¶9, 29 (claim 23 recites: "supplying one or more of video clips and digitized images"); *see Superguide Corp. v. DirecTV Enters.*, 358 F.3d 870, 885-86 (Fed. Cir. 2004) ("at least one of [X, Y,] *and* [Z]" means at least one of X, at least one of Y, and at least one of Z). CIVIX's misplaced contention that Hotels.com waived this position during claim construction is belied by Hotels.com's proposed, but ultimately rejected, "video" construction that mooted this particular question by rendering "video clips" and "digitized images" coextensive. D.I. 650 at 31-32.

### B. Hotels.com has not infringed claim 20 of the '622 patent because its "database" never stored any "video."

As with claim 23 of the '291 patent, to infringe the "video" element of claim 20 of the '622 patent, Hotels.com must store the virtual tours in its "database." Opp. at 23 ("Claim 26 … requires that 'video' be transmitted from a database to the user of the system."); SUF ¶15 & SAF ¶¶46-47 (alleging that only Hotels.com satisfies claim 20); SUF ¶80 (CIVIX's expert admitting: "So if Hotels.com does not store the Virtual Tours that CIVIX has accused of infringement on its database, it doesn't meet this element of the claim, correct? A. If it doesn't store, if it doesn't have possession of it, then that's correct."). Because Hotels.com has never stored any virtual tours in its database, it has not infringed claim 20. SUF ¶84.

### V. CIVIX IGNORES THE RELEVANT WILLFULNESS STANDARD AND CANNOT PROVE WILLFUL INFRINGEMENT.

CIVIX does not even address, let alone overcome, the threshold prong of the willfulness inquiry, requiring clear and convincing evidence of objectively reckless conduct. D.I. 683 at 24-25; *see, e.g., Uniloc USA*, 632 F.3d at 1310 (affirming JMOL of no willfulness, because Uniloc "failed to meet the threshold objective prong"). Where, as here, a party's actions are "susceptible to a

reasonable conclusion of no infringement, the first prong of *Seagate* cannot be met." *Id.* Since CIVIX alleged infringement, Hotels.com: (i) identified and detailed non-infringement defenses, including those outlined in this motion (Response to SAF ¶ 28); (ii) identified and asserted invalidity and unenforceability defenses (D.I. 585) — none of which CIVIX has even attempted to summarily resolve; (iii) was deemed a third-party beneficiary to prior CIVIX settlements and obtained partial summary judgment (D.I. 263); and (iv) had CIVIX withdraw its assertion of three patents and dozens of claims as a result of PTO reexamination and adverse claim constructions. SUF ¶¶4-13. None of this evidences an objectively high likelihood that Hotels.com took actions constituting infringement of a valid patent. *See, e.g., Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 260 Fed. Appx. 284, 291 (Fed. Cir. 2008) ("Under this objective standard, both legitimate defenses to infringement claims and credible invalidity arguments demonstrate the lack of an objectively high likelihood that a party took actions constituting infringement of a valid patent.").

Ignoring the requisite "objective" prong, CIVIX instead poses "largely inapposite" arguments relevant only to *Seagate*'s second subjective prong. *Cf.* Opp. at 24 (relying on pre-*Seagate* precedent) *with Uniloc*, 632 F.3d at 1311; *see also Spectralytics, Inc. v. Cordis Corp.*, 2011 WL 2307402, at *10 (Fed. Cir. June 13, 2011) ("there must be 'objective recklessness,' before failure to obtain an exculpatory opinion of counsel can establish willful infringement"). CIVIX fails here too. That Hotels.com received notice letters ████████████████████████████████████ ████████████████████ and by law cannot, prove that Hotels.com acted with bad faith. *See, e.g., Knorr-Bremse System Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1344-46 (Fed. Cir. 2004).

## VI.    CONCLUSION

For the reasons above, Hotels.com's motion for summary judgment should be granted.

Dated:  June 24, 2011

/s Atif Khawaja

Jonathan Putnam (jputnam@kirkland.com)
Atif Khawaja (akhawaja@kirkland.com)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Craig D. Leavell (cleavell@kirkland.com)
Aaron D. Charfoos (acharfoos@kirkland.com)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Attorneys for Defendants/Counterclaimants Hotels.com,
L.P., and Hotels.com GP, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2011 a true and correct copy of the foregoing HOTELS.COM'S REPLY IN SUPPORT OF ITS OMNIBUS MOTION FOR SUMMARY JUDGMENT was electronically filed with the Clerk of Court using the CM/ECF system, which will send notifications of such filing to the following email addresses:

Raymond P. Niro, Esq. (rniro@nshn.com)
David J. Sheikh, Esq. (sheikh@nshn.com)
Gregory P. Casimer, Esq. (casimer@nhsn.com)
Paul Vickrey, Esq. (vickrey@nhsn.com)
NIRO, HALLER & NIRO
181 West Madison Street, Suite 4600
Chicago, Illinois 60602
*Attorneys for Plaintiff CIVIX-DDI Inc.*

The SEALED HOTELS.COM'S REPLY IN SUPPORT OF ITS OMNIBUS MOTION FOR SUMMARY JUDGMENT was sent via messenger on June 24, 2011 to the following attorney of record:

Gregory P. Casimer, Esq.
NIRO, HALLER & NIRO
181 West Madison Street, Suite 4600
Chicago, Illinois 60602
*Attorney for Plaintiff CIVIX-DDI Inc.*

/s Craig D. Leavell
*Attorney for Defendants/Counterclaimants*
*Hotels.com, L.P. and Hotels.com GP, LLC*





Analysis
As of: Jun 24, 2011

GLOBAL-TECH APPLIANCES, INC., ET AL., PETITIONERS v. SEB S. A.

No. 10-6

SUPREME COURT OF THE UNITED STATES

*179 L. Ed. 2d 1167; 2011 U.S. LEXIS 4022; 98 U.S.P.Q.2D (BNA) 1665; 22 Fla. L. Weekly Fed. S 1062*

February 23, 2011, Argued
May 31, 2011, Decided

**NOTICE:**

The LEXIS pagination of this document is subject to change pending release of the final published version.

**PRIOR HISTORY:**  [**1]
ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT.
*SEB S.A. v. Montgomery Ward & Co., 594 F.3d 1360, 2010 U.S. App. LEXIS 2454 (Fed. Cir., 2010)*

**DISPOSITION:**     Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Respondent patent holder settled a lawsuit with a competitor, then sued petitioners, the competitor's designers and manufacturers, under *35 U.S.C.S. § 271(b)*, claiming petitioners actively induced the competitor and others to sell or to offer to sell infringing products. A jury found for the patent holder. The United States Court of Appeals for the Federal Circuit affirmed. Certiorari was granted on the issue of knowledge under *§ 271(b)*.

**OVERVIEW:** The addition of the adverb "actively" in *§ 271(b)* suggested that inducement had to involve taking affirmative steps to bring about the desired result. A closely divided court previously held that *§ 271(c)* re-

quired knowledge of the existence of the patent being infringed. That decision compelled the same knowledge for liability under *§ 271(b)*. The two provisions had a common origin and created the same difficult interpretive choice. It would have been strange to hold that knowledge of the patent was needed under *§ 271(c)* but not under *§ 271(b)*. Thus, induced infringement under *§ 271(b)* required knowledge that the induced acts constituted patent infringement. Deliberate indifference to a known risk that a patent existed was not the proper standard, but the appellate court's decision was affirmed because the evidence was plainly sufficient to support a finding of knowledge under the doctrine of willful blindness. Petitioners were indisputably aware that their customers were selling their product in the U.S. They copied all but the cosmetic features of the patent holder's product, based on an overseas model, knowing that the model was for the U.S. market but had no patent markings.

**OUTCOME:** The Court affirmed the judgment of the United States Court of Appeals for the Federal Circuit affirming the jury's verdict. 8-1 Decision; 1 Dissent.

**LexisNexis(R) Headnotes**

*Patent Law > Infringement Actions > Infringing Acts > Contributory, Indirect & Induced Infringement*
[HN1] See *35 U.S.C.S. § 271(b)*.

*Governments > Legislation > Interpretation*
*Patent Law > Infringement Actions > Infringing Acts >*
*Contributory, Indirect & Induced Infringement*
*Patent Law > Infringement Actions > Infringing Acts >*
*Intent & Knowledge*

[HN2] The addition of the adverb "actively" in *35 U.S.C.S. § 271(b)* suggests that the inducement must involve the taking of affirmative steps to bring about the desired result.

*Governments > Legislation > Interpretation*
*Patent Law > Infringement Actions > Infringing Acts >*
*Contributory, Indirect & Induced Infringement*
*Patent Law > Infringement Actions > Infringing Acts >*
*Intent & Knowledge*

[HN3] In referring to a party that "induces infringement," *35 U.S.C.S. § 271(b)* may require merely that the inducer lead another to engage in conduct that happens to amount to infringement, i.e., the making, using, offering to sell, selling, or importing of a patented invention. *35 U.S.C.S. § 271(a).* On the other hand, the reference to a party that "induces infringement" may also be read to mean that the inducer must persuade another to engage in conduct that the inducer knows is infringement. Both readings are possible.

*Patent Law > Infringement Actions > Infringing Acts >*
*Contributory, Indirect & Induced Infringement*
*Patent Law > Infringement Actions > Infringing Acts >*
*Intent & Knowledge*

[HN4] A violator of 11 U.S.C.S. § 271(c) must know that the combination for which his component was especially designed was both patented and infringing.

*Patent Law > Infringement Actions > Infringing Acts >*
*Contributory, Indirect & Induced Infringement*
*Patent Law > Infringement Actions > Infringing Acts >*
*Intent & Knowledge*

[HN5] See *35 U.S.C.S. § 271(c).*

*Patent Law > Infringement Actions > Infringing Acts >*
*Contributory, Indirect & Induced Infringement*
*Patent Law > Infringement Actions > Infringing Acts >*
*Intent & Knowledge*

[HN6] Induced infringement under *35 U.S.C.S. § 271(b)* requires knowledge that the induced acts constitute patent infringement.

*Patent Law > Infringement Actions > Infringing Acts >*
*Contributory, Indirect & Induced Infringement*
*Patent Law > Infringement Actions > Infringing Acts >*
*Intent & Knowledge*

[HN7] Deliberate indifference to a known risk that a patent exists is not the appropriate standard under *35 U.S.C.S. § 271(b).*

*Patent Law > Infringement Actions > Infringing Acts >*
*Contributory, Indirect & Induced Infringement*
*Patent Law > Infringement Actions > Infringing Acts >*
*Intent & Knowledge*

[HN8] Given the long history of willful blindness and its wide acceptance in the Federal Judiciary, the United States Supreme Court can see no reason why the doctrine should not apply in civil lawsuits for induced patent infringement under *35 U.S.C.S. § 271(b).*

*Criminal Law & Procedure > Scienter > Knowledge*
*Criminal Law & Procedure > Scienter > Negligence*
*Criminal Law & Procedure > Scienter > Recklessness*

[HN9] The doctrine of willful blindness has two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact. These requirements give willful blindness an appropriately limited scope that surpasses recklessness and negligence. Under this formulation, a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts. By contrast, a reckless defendant is one who merely knows of a substantial and unjustified risk of such wrongdoing, and a negligent defendant is one who should have known of a similar risk but, in fact, did not.

## SYLLABUS

[*1170] After respondent SEB invented an innovative deep fryer, obtained a U.S. patent for its design, and began selling its fryer in this country, Sunbeam Products, Inc., asked petitioner Pentalpha Enterprises, Ltd., a Hong Kong home appliance maker and wholly owned subsidiary of petitioner Global-Tech Appliances, Inc., to supply Sunbeam with deep fryers meeting certain specifications. Pentalpha purchased an SEB fryer that was made for sale in a foreign market and thus lacked U.S. patent markings, copied all but the fryer's cosmetic features, and retained an attorney to conduct a right-to-use study without telling him it had copied directly from SEB's design. Failing to locate SEB's patent, the attorney issued an opinion letter stating that Pentalpha's deep fryer did not infringe any of the patents that

he had found. Pentalpha then started selling its fryers to Sunbeam, which resold them in this country under its own trademarks at a price that undercut SEB's.

SEB then sued Sunbeam for patent infringement. Though Sunbeam notified Pentalpha of the lawsuit, Pentalpha went on to sell its [**2] fryers to other companies, which resold them in the U.S. market under their respective trademarks. After settling the Sunbeam lawsuit, SEB sued Pentalpha, asserting, as relevant here, that it had contravened *35 U.S.C. § 271(b)* by actively inducing Sunbeam and the other purchasers of Pentalpha fryers to sell or offer to sell them in violation of SEB's patent rights. The jury found for SEB on the induced infringement theory, and the District Court entered judgment for SEB. Affirming, the Federal Circuit stated that induced infringement under *§ 271(b)* requires a showing that the alleged infringer knew or should have known that his actions would induce actual infringements; declared that this showing includes proof that the alleged infringer knew of the patent; held that, although there was no direct evidence that Pentalpha knew of SEB's patent before it received notice of the Sunbeam suit, there was adequate proof that it deliberately disregarded a known risk that SEB had a protective patent; and said that such disregard is not different from, but a form of, actual knowledge.

*Held*:

1. Induced infringement under *§ 271(b)* requires knowledge that the induced acts constitute patent infringement. [**3] Pp. 3-10.

(a) *Section 271(b)*'s text -- "[w]hoever actively induces infringement of a patent shall be liable as an infringer" -- is ambiguous as to the intent needed to impose liability. In referring to a party that "induces infringement," the provision may require merely that the inducer must lead another to engage in conduct that happens to amount to infringement. On the other hand, the reference to a party that "induces infringement" may also be read to mean that the inducer must persuade another to engage in conduct that the inducer knows is infringement. Pp. 4-5.

(b) Like *§ 271(b)*'s language, the pre-1952 case law is susceptible to conflicting interpretations. However, *Aro Mfg. Co. v. , 377 U.S. 476, 84 S. Ct. 1526, 12 L. Ed. 2d 457, 1964 Dec. Comm'r Pat. 760 (Aro II)*, resolves the question at issue. Pp. 5-8.

[*1171] (c) Induced infringement was not considered a separate theory of indirect liability in the pre-1952 case law, but was treated as evidence of "contributory infringement," *i.e.*, the aiding and abetting of direct infringement by another party. When Congress enacted *§ 271*, it separated the contributory infringement concept into two categories: induced infringement, covered by *§ 271(b)*, and sale of a component [**4] of a patented invention, covered by *§ 271(c)*. In the badly fractured *Aro II* decision, a majority concluded that a violator of *§ 271(c)* must know "that the combination for which his component was especially designed was both patented and infringing." *377 U.S., at 488, 84 S. Ct. 1526, 12 L. Ed. 2d 457, 1964 Dec. Comm'r Pat. 760*. That conclusion, now a fixture in the law, compels this same knowledge for liability under *§ 271(b)*, given that the two provisions have a common origin and create the same difficult interpretive choice. Pp. 8-10.

2. Deliberate indifference to a known risk that a patent exists does not satisfy the knowledge required by *§ 271(b)*. Nevertheless, the Federal Circuit's judgment must be affirmed because the evidence in this case was plainly sufficient to support a finding of Pentalpha's knowledge under the doctrine of willful blindness. Pp. 10-16.

(a) The doctrine of willful blindness is well established in criminal law. Many criminal statutes require proof that a defendant acted knowingly or willfully, and courts applying the doctrine have held that defendants cannot escape the reach of these statutes by deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the circumstances. The [**5] traditional rationale for the doctrine is that defendants who behave in this manner are just as culpable as those who have actual knowledge. This Court endorsed a concept similar to willful blindness over a century ago in *Spurr v. United States, 174 U.S. 728, 735, 19 S. Ct. 812, 43 L. Ed. 1150*, and every Federal Court of Appeals but one has fully embraced willful blindness. Given the doctrine's long history and wide acceptance in the Federal Judiciary, there is no reason why the doctrine should not apply in civil lawsuits for induced patent infringement under *§ 271(b)*. Pp. 10-13.

(b) Although the Courts of Appeals articulate the doctrine of willful blindness in slightly different ways, all agree on two basic requirements: First, the defendant must subjectively believe that there is a high probability that a fact exists. Second, the defendant must take deliberate actions to avoid learning of that fact. These requirements give willful blindness an appropriately limited scope that surpasses recklessness and negligence. Pp. 13-14.

(c) Although the Federal Circuit's test departs from the proper willful blindness standard in important respects, the evidence when viewed in the light most favorable to the verdict for SEB [**6] was sufficient under the correct standard. Pentalpha believed that SEB's fryer embodied advanced technology that would be valuable in the U.S. market as evidenced by its decision to

copy all but the fryer's cosmetic features. Also revealing is Pentalpha's decision to copy an overseas model of SEB's fryer, aware that it would not bear U.S. patent markings. [*1172] Even more telling is Pentalpha's decision not to inform its attorney that the product to be evaluated was simply a knockoff of SEB's fryer. Taken together, the evidence was more than sufficient for a jury to find that Pentalpha subjectively believed there was a high probability that SEB's fryer was patented and took deliberate steps to avoid knowing that fact, and that it therefore willfully blinded itself to the infringing nature of Sunbeam's sales. Pp. 14-16.

*594 F.3d 1360*, affirmed.

**COUNSEL: William Dunnegan** argued the cause for petitioners.

**R. Ted Cruz** argued the cause for respondent.

**JUDGES:** ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, THOMAS, GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. KENNEDY, J., filed a dissenting opinion.

**OPINION BY:** ALITO

**OPINION**

JUSTICE ALITO delivered the opinion of the Court.

We consider whether a party who "actively induces infringement of a patent" under *35 U.S.C. § 271(b)* must know that [**7] the induced acts constitute patent infringement.

**I**

This case concerns a patent for an innovative deep fryer designed by respondent SEB S.A., a French maker of home appliances. In the late 1980's, SEB invented a "cool-touch" deep fryer, that is, a deep fryer for home use with external surfaces that remain cool during the frying process. The cool-touch deep fryer consisted of a metal frying pot surrounded by a plastic outer housing. Attached to the housing was a ring that suspended the metal pot and insulated the housing from heat by separating it from the pot, creating air space between the two components. SEB obtained a U.S. patent for its design in 1991, and sometime later, SEB started manufacturing the cool-touch fryer and selling it in this country under its well-known "T-Fal" brand. Superior to other products in the American market at the time, SEB's fryer was a commercial success.

In 1997, Sunbeam Products, Inc., a U.S. competitor of SEB, asked petitioner Pentalpha Enterprises, Ltd., to supply it with deep fryers meeting certain specifications.

Pentalpha is a Hong Kong maker of home appliances and a wholly owned subsidiary of petitioner Global-Tech Appliances, Inc. [1]

> 1   We refer to [**8] both petitioners as "Pentalpha."

In order to develop a deep fryer for Sunbeam, Pentalpha purchased an SEB fryer in Hong Kong and copied all but its cosmetic features. Because the SEB fryer bought in Hong Kong was made for sale in a foreign market, it bore no U.S. patent markings. After copying SEB's design, Pentalpha retained an attorney to conduct a right-to-use study, but Pentalpha refrained from telling the attorney that its design was copied directly from SEB's.

The attorney failed to locate SEB's patent, and in August 1997 he issued an opinion letter stating that Pentalpha's deep fryer did not infringe any of the patents that he had found. That same month, Pentalpha started selling its deep fryers to Sunbeam, which resold them in the United States under its trademarks. By obtaining its product from a manufacturer with lower production costs, Sunbeam was able to undercut SEB in the U.S. market.

[*1173] After SEB's customers started defecting to Sunbeam, SEB sued Sunbeam in March 1998, alleging that Sunbeam's sales infringed SEB's patent. Sunbeam notified Pentalpha of the lawsuit the following month. Undeterred, Pentalpha went on to sell deep fryers to Fingerhut Corp. and Montgomery Ward & [**9] Co., both of which resold them in the United States under their respective trademarks.

SEB settled the lawsuit with Sunbeam, and then sued Pentalpha, asserting two theories of recovery: First, SEB claimed that Pentalpha had directly infringed SEB's patent in violation of *35 U.S.C. § 271(a)*, by selling or offering to sell its deep fryers; and second, SEB claimed that Pentalpha had contravened *§ 271(b)* by actively inducing Sunbeam, Fingerhut, and Montgomery Ward to sell or to offer to sell Pentalpha's deep fryers in violation of SEB's patent rights.

Following a 5-day trial, the jury found for SEB on both theories and also found that Pentalpha's infringement had been willful. Pentalpha filed post-trial motions seeking a new trial or judgment as a matter of law on several grounds. As relevant here, Pentalpha argued that there was insufficient evidence to support the jury's finding of induced infringement under *§ 271(b)* because Pentalpha did not actually know of SEB's patent until it received the notice of the Sunbeam lawsuit in April 1998.

The District Court rejected Pentalpha's argument, as did the Court of Appeals for the Federal Circuit, which affirmed the judgment, *SEB S. A. v. Montgomery Ward & Co., 594 F.3d 1360 (2010).* [**10] Summarizing a recent en banc decision, the Federal Circuit stated that induced infringement under *§ 271(b)* requires a "plaintiff [to] show that the alleged infringer knew or should have known that his actions would induce actual infringements" and that this showing includes proof that the alleged infringer knew of the patent. *Id., at 1376.* Although the record contained no direct evidence that Pentalpha knew of SEB's patent before April 1998, the court found adequate evidence to support a finding that "Pentalpha deliberately disregarded a known risk that SEB had a protective patent." *Id., at 1377.* Such disregard, the court said, "is not different from actual knowledge, but is a form of actual knowledge." *Ibid.*

We granted certiorari. *562 U.S. ___, 131 S. Ct. 458, 178 L. Ed. 2d 286 (2010).*

II

Pentalpha argues that active inducement liability under *§ 271(b)* requires more than deliberate indifference to a known risk that the induced acts may violate an existing patent. Instead, Pentalpha maintains, actual knowledge of the patent is needed.

A

In assessing Pentalpha's argument, we begin with the text of *§ 271(b)* -- which is short, simple, and, with respect to the question presented in this case, inconclusive. *Section 271(b)* states: [**11] [HN1] "Whoever actively induces infringement of a patent shall be liable as an infringer."

Although the text of *§ 271(b)* makes no mention of intent, we infer that at least some intent is required. The term "induce" means "[t]o lead on; to influence; to prevail on; to move by persuasion or influence." Webster's New International Dictionary 1269 [**1174] (2d ed. 1945). [HN2] The addition of the adverb "actively" suggests that the inducement must involve the taking of affirmative steps to bring about the desired result, see *id.*, at 27.

When a person actively induces another to take some action, the inducer obviously knows the action that he or she wishes to bring about. If a used car salesman induces a customer to buy a car, the salesman knows that the desired result is the purchase of the car. But what if it is said that the salesman induced the customer to buy a *damaged* car? Does this mean merely that the salesman induced the customer to purchase a car that happened to be damaged, a fact of which the salesman may have been unaware? Or does this mean that the salesman knew that the car was damaged? The statement that the salesman induced the customer to buy a damaged car is ambiguous.

So is *§ 271(b).* [HN3] In referring [**12] to a party that "induces infringement," this provision may require merely that the inducer lead another to engage in conduct that happens to amount to infringement, *i.e.*, the making, using, offering to sell, selling, or importing of a patented invention. See *§ 271(a).* [2] On the other hand, the reference to a party that "induces infringement" may also be read to mean that the inducer must persuade another to engage in conduct that the inducer knows is infringement. Both readings are possible.

> 2  Direct infringement has long been understood to require no more than the unauthorized use of a patented invention. See *Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 484, 84 S. Ct. 1526, 12 L. Ed. 2d 457, 1964 Dec. Comm'r Pat. 760 (1964)*; 3 A. Deller, Walker on Patents § 453, p. 1684 (1937) (hereinafter Deller). Thus, a direct infringer's knowledge or intent is irrelevant.

B

Finding no definitive answer in the statutory text, we turn to the case law that predates the enactment of *§ 271* as part the Patent Act of 1952. As we recognized in *Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 84 S. Ct. 1526, 12 L. Ed. 2d 457, 1964 Dec. Comm'r Pat. 760 (1964) (Aro II),* "[t]he section was designed to 'codify in statutory form principles of contributory infringement' which had been 'part of our law [**13] for about 80 years.'" *Id., at 485-486, n. 6, 84 S. Ct. 1526, 12 L. Ed. 2d 457, 1964 Dec. Comm'r Pat. 760* (quoting H. R. Rep. No. 1923, 82d Cong., 2d Sess., 9 (1952)).

Unfortunately, the relevant pre-1952 cases are less clear than one might hope with respect to the question presented here. Before 1952, both the conduct now covered by *§ 271(b)* (induced infringement) and the conduct now addressed by *§ 271(c)* (sale of a component of a patented invention) were viewed as falling within the overarching concept of "contributory infringement." Cases in the latter category -- *i.e.*, cases in which a party sold an item that was not itself covered by the claims of a patent but that enabled another party to make or use a patented machine, process, or combination -- were more common.

The pre-1952 case law provides conflicting signals regarding the intent needed in such cases. In an oft-cited decision, then-Judge Taft suggested that it was sufficient if the seller of the component part intended that the part be used in an invention that happened to infringe a patent. He wrote that it was "well settled that where one makes and sells one element of a combination covered

by a patent with the intention and for the purpose of bringing about its use in such a combination [**14] he is guilty [*1175] of contributory infringement." *Thomson-Houston Elec. Co. v. Ohio Brass Co.,* 80 F. 712, 721, 1897 Dec. Comm'r Pat. 579 (CA6 1897). ³

> 3   For an article that is particularly clear on this point, see H. Howson, Paper before American Association of Inventors and Manufacturers, Washington, D. C., Contributory Infringement of Patents 9 (Jan. 1895) (reading late 19th-century case law to require only that a party "intentionally contribut[e] to the *act*, which the Court holds to be an infringement" (emphasis in original)). Other authorities from this era likewise suggest that it was sufficient if the seller intended a component part to be used in a manner that happened to infringe a patent. See, *e.g.*, *Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co.,* 152 U.S. 425, 433, 14 S. Ct. 627, 38 L. Ed. 500, 1894 Dec. Comm'r Pat. 238 (1894) ("There are doubtless many cases to the effect that the manufacture and sale of a single element of a combination, with intent that it shall be united to the other elements, and so complete the combination, is an infringement"); *Individual Drinking Cup Co. v. Errett,* 297 F. 733, 739-740 (CA2 1924) ("[B]efore one may be held for contributory infringement, it must be shown that he had knowingly done some act without which the infringement [**15] would not have occurred"); *New York Scaffolding Co. v. Whitney,* 224 F. 452, 459 (CA8 1915) ("Contributory infringement is the intentional aiding of one person by another in the unlawful making, or selling, or using of a third person's patented invention"); 3 Deller § 507, at 1764-1765 ("[W]here a person furnishes one part of a patented combination, intending that it shall be assembled with the other parts thereof, and that the complete combination shall be used or sold; that person is liable to an action, as infringer of the patent on the complete combination"); 3 W. Robinson, Patents § 924, p. 101 (1890) ("To make or sell a single element with the intent that it shall be united to the other elements, and so complete the combination, is infringement").

On the other hand, this Court, in *Henry v. A. B. Dick Co.,* 224 U.S. 1, 32 S. Ct. 364, 56 L. Ed. 645, 1912 Dec. Comm'r Pat. 575 (1912), overruled on other grounds, *Motion Picture Patents Co. v. Universal Film Mfg. Co.,* 243 U.S. 502, 37 S. Ct. 416, 61 L. Ed. 871, 1917 Dec. Comm'r Pat. 391 (1917), stated that "if the defendants [who were accused of contributory infringement] *knew of the patent* and that [the direct infringer] had unlawfully made the patented article . . . with the intent and purpose

that [the direct infringer] should use the infringing [**16] article . . . they would assist in her infringing use." *224 U.S., at 33, 32 S. Ct. 364, 56 L. Ed. 645, 1912 Dec. Comm'r Pat. 575* (emphasis added and deleted). ⁴ Our decision in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 125 S. Ct. 2764, 162 L. Ed. 2d 781 (2005), which looked to the law of contributory patent infringement for guidance in determining the standard to be applied in a case claiming contributory copyright infringement, contains dicta that may be read as interpreting the pre-1952 cases this way. In *Grokster,* we said that "[t]he inducement [*1176] rule . . . premises liability on purposeful, culpable expression and conduct." *Id., at 937, 125 S. Ct. 2764, 162 L. Ed. 2d 781.*

> 4   The earlier case of *Cortelyou v. Charles Eneu Johnson & Co.,* 207 U.S. 196, 28 S. Ct. 105, 52 L. Ed. 167, 1907 Dec. Comm'r Pat. 700 (1907), contains language that may be read as adopting a similar position. In that case, the Neostyle Company had a patent for a "stencil duplicating machine" called the "rotary Neostyle," and it licensed the use of its machine pursuant to a license requiring the licensee to use only Neostyle's ink. *Id., at 198, 28 S. Ct. 105, 52 L. Ed. 167, 1907 Dec. Comm'r Pat. 700.* Another company, Charles Eneu Johnson & Co., sold its ink to a Neostyle licensee, and Neostyle sued the Johnson company, claiming that it was "inducing a breach of the license contracts" and was thus indirectly infringing Neostyle's patent [**17] rights. *Id., at 199, 28 S. Ct. 105, 52 L. Ed. 167, 1907 Dec. Comm'r Pat. 700.* The Court held that the defendant did not have "sufficient evidence of notice" to support liability. The Court wrote:
>
> > "True, the defendant filled a few orders for ink to be used on a rotary Neostyle, but it does not appear that it ever solicited an order for ink to be so used, *that it was ever notified by the plaintiffs of the rights which they claimed,* or that anything which it did was considered by them an infringement upon those rights." *Id., at 200, 28 S. Ct. 105, 52 L. Ed. 167, 1907 Dec. Comm'r Pat. 700* (emphasis added).
>
> The italicized language above may suggest that it was necessary to show that the defendants had notice of Neostyle's patent rights. See also *Tubular Rivet & Stud Co. v. O'Brien,* 93 F. 200, 203 (CC Mass. 1898) ("a necessary condition of the defendant's guilt is his knowledge of the complainant's patent").

While both the language of *§ 271(b)* and the pre-1952 case law that this provision was meant to codify are susceptible to conflicting interpretations, our deci-

sion in *Aro II* resolves the question in this case. In *Aro II*, a majority held that [HN4] a violator of *§ 271(c)* must know "that the combination for which his component was especially designed was both patented and infringing," *377 U.S., at 488, 84 S. Ct. 1526, 12 L. Ed. 2d 457, 1964 Dec. Comm'r Pat. 760*, and [**18] as we explain below, that conclusion compels this same knowledge for liability under *§ 271(b)*.

C

As noted above, induced infringement was not considered a separate theory of indirect liability in the pre-1952 case law. Rather, it was treated as evidence of "contributory infringement," that is, the aiding and abetting of direct infringement by another party. See Lemley, Inducing Patent Infringement, *39 U. C. D. L. Rev. 225, 227 (2005)*. When Congress enacted *§ 271*, it separated what had previously been regarded as contributory infringement into two categories, one covered by *§ 271(b)* and the other covered by *§ 271(c)*.

*Aro II* concerned *§ 271(c)*, which states in relevant part:

[HN5] "Whoever offers to sell or sells . . . a component of a patented [invention] . . ., constituting a material part of the invention, *knowing the same to be especially made or especially adapted for use in an infringement* of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer." (Emphasis added.)

This language contains exactly the same ambiguity as *§ 271(b)*. The phrase "knowing [a component] to be especially made or especially [**19] adapted for use in an infringement" may be read to mean that a violator must know that the component is "especially adapted for use" in a product that happens to infringe a patent. Or the phrase may be read to require, in addition, knowledge of the patent's existence.

This question closely divided the *Aro II* Court. In a badly fractured decision, a majority concluded that knowledge of the patent was needed. *377 U.S., at 488 and n. 8, 84 S. Ct. 1526, 12 L. Ed. 2d 457, 1964 Dec. Comm'r Pat. 760*, *id.*, at 514, 84 S. Ct. 1526, 12 L. Ed. 2d 457, 1964 Dec. Comm'r Pat. 760 (White, J., concurring); *id.*, at 524-527, 84 S. Ct. 1526, 12 L. Ed. 2d 457, 1964 Dec. Comm'r Pat. 760 (Black, J., dissenting). [5] Justice Black's opinion, which explained the basis for the majority's view, concluded that the language of *§ 271(c)* supported this interpretation. See *id., at 525, 84 S. Ct. 1526,*

*12 L. Ed. 2d 457, 1964 Dec. Comm'r Pat. 760*. His opinion also relied on an amendment to this language that was adopted when the bill was in committee. *Id., at 525-527, 84 S. Ct. 1526, 12 L. Ed. 2d 457, 1964 Dec. Comm'r Pat. 760*.

5   Although Justice Black disagreed with the judgment and was thus in dissent, he was in the majority with respect to the interpretation of *§ 271(c)*, and his opinion sets out the reasoning of the majority on this point. Three other Justices joined his opinion, and a fourth, Justice White, endorsed his reasoning with respect to the interpretation of *§ 271(c)*. See *377 U.S., at 514, 84 S. Ct. 1526, 12 L. Ed. 2d 457, 1964 Dec. Comm'r Pat. 760* (White, J., concurring).

Four [**20] Justices disagreed with this interpretation and would have held that a violator of *§ 271(c)* need know [*1177] only that the component is specially adapted for use in a product that happens to infringe a patent. See *id., at 488-490, n. 8, 84 S. Ct. 1526, 12 L. Ed. 2d 457, 1964 Dec. Comm'r Pat. 760*. These Justices thought that this reading was supported by the language of *§ 271(c)* and the pre-1952 case law, and they disagreed with the inference drawn by the majority from the amendment of *§ 271(c)*'s language. *Ibid.*

While there is much to be said in favor of both views expressed in *Aro II*, the "holding in *Aro II* has become a fixture in the law of contributory infringement under *[section] 271(c)*," 5 R. Moy, Walker on Patents § 15:20, p. 15-131 (4th ed. 2009) -- so much so that SEB has not asked us to overrule it, see Brief for Respondent 19, n. 3. Nor has Congress seen fit to alter *§ 271(c)*'s intent requirement in the nearly half a century since *Aro II* was decided. In light of the "'special force'" of the doctrine of *stare decisis* with regard to questions of statutory interpretation, see *John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 139, 128 S. Ct. 750, 169 L. Ed. 2d 591 (2008)*, we proceed on the premise that *§ 271(c)* requires knowledge of the existence of the patent that is infringed.

Based [**21] on this premise, it follows that the same knowledge is needed for induced infringement under *§ 271(b)*. As noted, the two provisions have a common origin in the pre-1952 understanding of contributory infringement, and the language of the two provisions creates the same difficult interpretive choice. It would thus be strange to hold that knowledge of the relevant patent is needed under *§ 271(c)* but not under *§ 271(b)*.

Accordingly, we now hold that [HN6] induced infringement under *§ 271(b)* requires knowledge that the induced acts constitute patent infringement.

III

Returning to Pentalpha's principal challenge, we agree that [HN7] deliberate indifference to a known risk that a patent exists is not the appropriate standard under *§ 271(b)*. We nevertheless affirm the judgment of the Court of Appeals because the evidence in this case was plainly sufficient to support a finding of Pentalpha's knowledge under the doctrine of willful blindness.

A

The doctrine of willful blindness is well established in criminal law. Many criminal statutes require proof that a defendant acted knowingly or willfully, and courts applying the doctrine of willful blindness hold that defendants cannot escape the reach of these statutes [**22] by deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the circumstances. The traditional rationale for this doctrine is that defendants who behave in this manner are just as culpable as those who have actual knowledge. Edwards, The Criminal Degrees of Knowledge, 17 Mod. L. Rev. 294, 302 (1954) (hereinafter Edwards) (observing on the basis of English authorities that "up to the present day, no real doubt has been cast on the proposition that [willful blindness] is as culpable as actual knowledge"). It is also said that persons who know enough to blind themselves to direct proof of critical facts in effect have actual knowledge of those facts. See *United States v. Jewell, 532 F.2d 697, 700 (CA9 1976)* (en banc).

This Court's opinion more than a century ago in *Spurr v. United States,* [*1178] *174 U.S. 728, 19 S. Ct. 812, 43 L. Ed. 1150 (1899),* [6] while not using the term "willful blindness," endorsed a similar concept. The case involved a criminal statute that prohibited a bank officer from "willfully" certifying a check drawn against insufficient funds. We said that a willful violation would occur "if the [bank] officer purposely keeps himself in ignorance of whether the drawer [**23] has money in the bank." *Id., at 735, 19 S. Ct. 812, 43 L. Ed. 1150.* Following our decision in *Spurr,* several federal prosecutions in the first half of the 20th century invoked the doctrine of willful blindness. [7] Later, a 1962 proposed draft of the Model Penal Code, which has since become official, attempted to incorporate the doctrine by defining "knowledge of the existence of a particular fact" to include a situation in which "a person is aware of a high probability of [the fact's] existence, unless he actually believes that it does not exist." ALI, *Model Penal Code § 2.02(7)* (Proposed Official Draft 1962). Our Court has used the Code's definition as a guide in analyzing whether certain statutory presumptions of knowledge comported with due process. See *Turner v. United States, 396 U.S. 398, 416-417, 90 S. Ct. 642, 24 L. Ed. 2d 610 (1970); Leary v. United States, 395 U.S. 6, 46-47, 89 S. Ct. 1532, 23 L. Ed. 2d 57, and n. 93 (1969).* And every Court of Appeals -- with the possible exception of the District of Columbia Circuit, see n. 9, *infra* -- has fully embraced willful blindness, applying the doctrine to a wide range of criminal statutes.

6   The doctrine emerged in English law almost four decades earlier and became firmly established by the end of the 19th century. Edwards 298-301. [**24] In American law, one of the earliest references to the doctrine appears in an 1882 jury charge in a federal prosecution. In the charge, the trial judge rejected the "great misapprehension" that a person may "close his eyes, when he pleases, upon all sources of information, and then excuse his ignorance by saying that he does not see anything." See *United States v. Houghton, 14 F. 544, 547 (DC NJ).*

7   *United States v. Yasser, 114 F.2d 558, 560 (CA3 1940)* (interpreting the crime of knowingly and fraudulently concealing property belonging to the estate of a bankrupt debtor to include someone who "closed his eyes to facts which made the existence of" the receiver or trustee "obvious"); *Rachmil v. United States, 43 F.2d 878, 881 (CA9 1930) (per curiam)* (same); *United States v. Erie R. Co., 222 F. 444, 448-451 (DC NJ 1915)* (approving a "willful ignorance" jury instruction to a charge that a rail carrier knowingly granted a concession to a shipper); *Grant Bros. Constr. Co. v. United States, 13 Ariz. 388, 400, 114 P. 955, 959 (1911)* (interpreting the crime of knowingly encouraging the importation of contract laborers to include those who "willfully and intentionally ignored facts and circumstances [**25] known to them, which would have led to [actual] knowledge").

[HN8] Given the long history of willful blindness and its wide acceptance in the Federal Judiciary, we can see no reason why the doctrine should not apply in civil lawsuits for induced patent infringement under *35 U.S.C. § 271(b)*. [8]

8   Unlike the dissent, we do not think that utilitarian concerns demand a stricter standard for knowledge under *§ 271(b)*, see *post*, at 3 (opinion of KENNEDY, J.). The dissent does not explain -- nor can we see -- why promoting "'the Progress of Science and useful Arts,'" *ibid.*, requires protecting parties who actively encourage others to violate patent rights and who take deliberate steps to remain ignorant of those rights despite a high probability that the rights exist and are being infringed, see *infra*, at 13-14.

Pentalpha urges us not to take this step, arguing that *§ 271(b)* demands more than willful blindness with re-

spect to *the induced acts* that constitute infringement. See Reply Brief for Petitioners 13-14. This question, however, is not at issue here. There is no need to invoke the doctrine of willful [*1179] blindness to establish that Pentalpha knew that the retailers who purchased its fryer were selling [**26] that product in the American market; Pentalpha was indisputably aware that its customers were selling its product in this country.

Pentalpha further contends that this Court in *Grokster* did not accept the Solicitor General's suggestion that Grokster and StreamCast could be held liable for inducing the infringement of copyrights under a theory of willful blindness. Reply Brief for Petitioners 14 (citing Brief for United States, O. T. 2004, No. 04-480, pp. 29-30). But the Court had no need to consider the doctrine of willful blindness in that case because the Court found ample evidence that Grokster and StreamCast were fully aware -- in the ordinary sense of the term -- that their file-sharing software was routinely used in carrying out the acts that constituted infringement (the unauthorized sharing of copyrighted works) and that these acts violated the rights of copyright holders. See *545 U.S., at 922-927, 937-940, 125 S. Ct. 2764, 162 L. Ed. 2d 781* .

B

While the Courts of Appeals articulate [HN9] the doctrine of willful blindness in slightly different ways, all appear to agree on two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take [**27] deliberate actions to avoid learning of that fact. [9] We think these requirements give willful blindness an appropriately limited scope that surpasses recklessness and negligence. Under this formulation, a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts. See G. Williams, Criminal Law § 57, p. 159 (2d ed. 1961) ("A court can properly find wilful blindness only where it can almost be said that the defendant actually knew"). By contrast, a reckless defendant is one who merely knows of a substantial and unjustified risk of such wrongdoing, see ALI, *Model Penal Code § 2.02(2)(c)* (1985), and a negligent defendant is one who should have known of a similar risk but, in fact, did not, see *§ 2.02(2)(d)*.

9 *United States v. Perez-Melendez, 599 F.3d 31, 41 (CA1 2010); United States v. Svoboda, 347 F.3d 471, 477-478 (CA2 2003); United States v. Stadtmauer, 620 F.3d 238, 257 (CA3 2010); United States v. Schnabel, 939 F.2d 197, 203 (CA4 1991)* ("The willful blindness instruction allows the jury to impute the element of knowledge to the defendant if the evidence [**28] indicates that he purposely closed his eyes to avoid knowing what was taking place around him"); *United States v. Freeman, 434 F.3d 369, 378 (CA5 2005); United States v. Holloway, 731 F.2d 378, 380-381 (CA6 1984) (per curiam)* (upholding jury instruction on knowledge when "it prevent[ed] a criminal defendant from escaping conviction merely by deliberately closing his eyes to the obvious risk that he is engaging in unlawful conduct"); *United States v. Draves, 103 F.3d 1328, 1333 (CA7 1997)* ("knowledge may in some circumstances be inferred from strong suspicion of wrongdoing coupled with active indifference to the truth"); *United States v. Florez, 368 F.3d 1042, 1044 (CA8 2004)* ("Ignorance is deliberate if the defendant was presented with facts that put her on notice that criminal activity was particularly likely and yet she intentionally failed to investigate those facts"); *United States v. Heredia, 483 F.3d 913, 917, 920 (CA9 2007)* (en banc); *United States v. Glick, 710 F.2d 639, 643 (CA10 1983); United States v. Perez-Tosta, 36 F.3d 1552, 1564 (CA11 1994)*. But see *United States v. Alston-Graves, 435 F.3d 331, 339-341, 369 U.S. App. D.C. 219 (CADC 2006)*.

The test applied by the Federal Circuit in this case [**29] departs from the proper willful blindness standard in two important respects. First, it permits [*1180] a finding of knowledge when there is merely a "known risk" that the induced acts are infringing. Second, in demanding only "deliberate indifference" to that risk, the Federal Circuit's test does not require active efforts by an inducer to avoid knowing about the infringing nature of the activities.

In spite of these flaws, we believe that the evidence when viewed in the light most favorable to the verdict for SEB is sufficient under the correct standard. The jury could have easily found that before April 1998 Pentalpha willfully blinded itself to the infringing nature of the sales it encouraged Sunbeam to make. [10]

10 The District Court did not instruct the jury according to the standard we set out today, see App. to Brief for Respondent 26-27, and Pentalpha asks us to remand the case so it can move for a new trial. We reject that request. Pentalpha did not challenge the jury instructions in the Court of Appeals, see Brief for Appellants in No. 2009-1099 etc. (CA Fed.), pp. 21-22, and that court did not pass upon the issue. Finding no "exceptional" circumstances in this case, we follow our [**30] usual course and refuse to consider the issue. See *Youakim v. Miller, 425 U.S.*

*231, 234, 96 S. Ct. 1399, 47 L. Ed. 2d 701 (1976)
(per curiam).*

SEB's cool-touch fryer was an innovation in the U.S.
market when Pentalpha copied it. App. to Brief for Respondent 49. As one would expect with any superior
product, sales of SEB's fryer had been growing for some
time. *Ibid.* Pentalpha knew all of this, for its CEO and
president, John Sham, testified that, in developing a
product for Sunbeam, Pentalpha performed "market research" and "gather[ed] information as much as possible." App. 23a. Pentalpha's belief that SEB's fryer embodied advanced technology that would be valuable in the
U.S. market is evidenced by its decision to copy all but
the cosmetic features of SEB's fryer.

Also revealing is Pentalpha's decision to copy an
overseas model of SEB's fryer. Pentalpha knew that the
product it was designing was for the U.S. market, and
Sham -- himself a named inventor on numerous U.S.
patents, see *id.*, at 78a-86a -- was well aware that products made for overseas markets usually do not bear U.S.
patent markings, App. in No. 2009-1099 etc. (CA Fed.),
pp. A-1904 to A-1906. Even more telling is Sham's decision not to inform the attorney  [**31] from whom Pentalpha sought a right-to-use opinion that the product to be
evaluated was simply a knockoff of SEB's deep fryer. On
the facts of this case, we cannot fathom what motive
Sham could have had for withholding this information
other than to manufacture a claim of plausible deniability
in the event that his company was later accused of patent
infringement. Nor does Sham's testimony on this subject
provide any reason to doubt that inference. Asked
whether the attorney would have fared better had he
known of SEB's design, Sham was nonresponsive. All he
could say was that a patent search is not an "easy job"
and that is why he hired attorneys to perform them. App.
112a.

Taken together, this evidence was more than sufficient for a jury to find that Pentalpha subjectively believed there was a high probability that SEB's fryer was
patented, that Pentalpha took deliberate steps to avoid
knowing that fact, and that it therefore willfully blinded
itself to the infringing nature of Sunbeam's sales.

\* \* \*

The judgment of the United States Court of Appeals
for the Federal Circuit is

Affirmed.

**DISSENT BY:** KENNEDY

**DISSENT**

[*1181]   JUSTICE KENNEDY, dissenting.

The Court is correct, in my view, to conclude that *35
U.S.C. § 271(b)*  [**32] must be read in tandem with *§
271(c)*, and therefore that to induce infringement a defendant must know "the induced acts constitute patent
infringement." *Ante*, at 10.

Yet the Court does more. Having interpreted the
statute to require a showing of knowledge, the Court
holds that willful blindness will suffice. This is a mistaken step. Willful blindness is not knowledge; and judges
should not broaden a legislative proscription by analogy.
See *United States v. Jewell, 532 F.2d 697, 706 (CA9
1976)* (en banc) (Kennedy, J., dissenting) ("When a statute specifically requires knowledge as an element of a
crime, however, the substitution of some other state of
mind cannot be justified even if the court deems that
both are equally blameworthy") In my respectful submission, the Court is incorrect in the definition it now
adopts; but even on its own terms the Court should remand to the Court of Appeals to consider in the first instance whether there is sufficient evidence of knowledge
to support the jury's finding of inducement.

The Court invokes willful blindness to bring those
who lack knowledge within *§ 271(b)*'s prohibition. Husak & Callender, Wilful Ignorance, Knowledge, and the
"Equal Culpability"  [**33] Thesis: A Study of the
Deeper Significance of the Principle of Legality, *1994
Wis. L. Rev. 29, 35*; see also L. Alexander & K. Ferzan,
Crime and Culpability: A Theory of Criminal Law 34-35
(2009) (cautioning against the temptation to "distort"
cases of willful blindness "into cases of knowledge"); G.
Williams, Criminal Law: The General Part § 57, p. 157
(2d ed. 1961). The Court's definition of willful blindness
reveals this basic purpose. One can believe that there is a
"high probability" that acts might infringe a patent but
nonetheless conclude they do not infringe. *Ante*, at 14;
see also *ibid.* (describing a willfully blind defendant as
one "who can almost be said to have actually known the
critical facts"). The alleged inducer who believes a device is noninfringing cannot be said to know otherwise.

The Court justifies its substitution of willful blindness for the statutory knowledge requirement in two
ways, neither of which is convincing.

First, the Court appeals to moral theory by citing the
"traditional rationale" that willfully blind defendants "are
just as culpable as those who have actual knowledge."
*Ante*, at 10. But the moral question is a difficult one. Is it
true that the lawyer  [**34] who knowingly suborns
perjury is no more culpable than the lawyer who avoids
learning that his client, a criminal defendant, lies when
he testifies that he was not the shooter? See Hellman,
Willfully Blind for Good Reason, 3 Crim. L. & Philosophy 301, 305-308 (2009); Luban, Contrived Ignorance,
*87 Geo. L. J. 957 (1999)*. The answer is not obvious.

Perhaps the culpability of willful blindness depends on a person's reasons for remaining blind. *E.g.*, *ibid.* Or perhaps only the person's justification for his conduct is relevant. *E.g.*, Alexander & Ferzan, *supra*, at 23-68. This is a question of morality and of policy best left to the political branches. Even if one were to accept the substitution of equally blameworthy mental states in criminal cases in [*1182] light of the retributive purposes of the criminal law, those purposes have no force in the domain of patent law that controls in this case. The Constitution confirms that the purpose of the patent law is a utilitarian one, to "promote the Progress of Science and useful Arts," Art. I, § 8, cl. 8.

Second, the Court appeals to precedent, noting that a "similar concept" to willful blindness appears in this Court's cases as early as 1899. *Ante*, at [**35] 11. But this Court has never before held that willful blindness can substitute for a statutory requirement of knowledge. *Spurr v. United States, 174 U.S. 728, 735, 19 S. Ct. 812, 43 L. Ed. 1150 (1899)*, explained that "evil design may be presumed if the [bank] officer purposefully keeps himself in ignorance of whether the drawer has money in the bank or not, or is grossly indifferent to his duty in respect to the ascertainment of that fact." The question in *Spurr* was whether the defendant's admitted violation was willful, and with this sentence the Court simply explained that wrongful intent may be inferred from the circumstances. It did not suggest that blindness can substitute for knowledge. Neither did *Turner v. United States, 396 U.S. 398, 90 S. Ct. 642, 24 L. Ed. 2d 610 (1970)*, or *Leary v. United States, 395 U.S. 6, 89 S. Ct. 1532, 23 L. Ed. 2d 57 (1969)*. As the Court here explains, both cases held only that certain statutory presumptions of knowledge were consistent with due process. *Ante*, at 12. And although most Courts of Appeals have embraced willful blindness, counting courts in a circuit split is not this Court's usual method for deciding important questions of law.

The Court appears to endorse the willful blindness doctrine here for all federal criminal cases involving [**36] knowledge. It does so in a civil case where it has received no briefing or argument from the criminal defense bar, which might have provided important counsel on this difficult issue.

There is no need to invoke willful blindness for the first time in this case. Facts that support willful blindness are often probative of actual knowledge. Circumstantial facts like these tend to be the only available evidence in any event, for the jury lacks direct access to the defendant's mind. The jury must often infer knowledge from conduct, and attempts to eliminate evidence of knowledge may justify such inference, as where an accused inducer avoids further confirming what he already believes with good reason to be true. The majority's decision to expand the statute's scope appears to depend on the unstated premise that knowledge requires certainty, but the law often permits probabilistic judgments to count as knowledge. Cf. *Connecticut Mut. Life Ins. Co. v. Lathrop, 111 U.S. 612, 620, 4 S. Ct. 533, 28 L. Ed. 536 (1884)* (Harlan, J.) ("[B]eing founded on actual observation, and being consistent with common experience and the ordinary manifestations of the condition of the mind, it is knowledge, so far as the human intellect can [**37] acquire knowledge, upon such subjects").

The instant dispute provides a case in point. Pentalpha copied an innovative fryer. The model it copied bore no U.S. patent markings, but that could not have been a surprise, for Pentalpha knew that a fryer purchased in Hong Kong was unlikely to bear such markings. And Pentalpha failed to tell the lawyer who ran a patent search that it copied the SEB fryer. [*1183] These facts may suggest knowledge that Pentalpha's fryers were infringing, and perhaps a jury could so find.

But examining the sufficiency of the evidence presented in the 5-day trial requires careful review of an extensive record. The trial transcript alone spans over 1,000 pages. If willful blindness is as close to knowledge and as far from the "knew or should have known" jury instruction provided in this case as the Court suggests, then reviewing the record becomes all the more difficult. I would leave that task to the Court of Appeals in the first instance on remand.

For these reasons, and with respect, I dissent.

--- F.3d ----, 2011 WL 2307402 (C.A.Fed. (Mass.))
**(Cite as: 2011 WL 2307402 (C.A.Fed. (Mass.)))**



Only the Westlaw citation is currently available.

United States Court of Appeals,
Federal Circuit.
SPECTRALYTICS, INC., Plaintiff–Appellant,
v.
CORDIS CORPORATION, Defendant–Cross Appellant,
and
Norman Noble, Inc., Defendant–Cross Appellant.

Nos. 2009–1564, 2010–1004.
June 13, 2011.

Appeal from the United States District Court for the District of Minnesota in Case No. 05–CV–1464, Judge J. Derek Patrick J. Schiltz.
J. Derek Vandenburgh, Carlson Caspers Vandenburgh & Lindquist, P.A., of Minneapolis, MN, argued for plaintiff-appellant. With him on the brief were Alan G. Carlson, Matthew J. Goggin and Dennis C. Bremer.

Gregory L. Diskant, Patterson, Belknap Webb & Tyler LLP, of New York, NY, argued for defendants-cross appellants. With him on the brief were Eugene M. Gelernter and Robert W. Lehrburger. Of counsel on the brief was James B. Niehaus, Frantz Ward LLP, of Cleveland, OH, for defendant-cross appellant Norman Noble Inc.

Before NEWMAN, CLEVENGER and BRYSON Circuit Judges.

NEWMAN, Circuit Judge.
**\*1** In this suit for infringement of United States Patent No. 5,852,277 ("the '277 patent"), brought by Spectralytics, Inc., trial was held in the United States District Court for the District of Minnesota. The jury sustained the validity of the patent, found that the defendants Cordis Corporation and Norman Noble, Inc. willfully infringed the patent, and awarded damages calculated as a 5–percent royalty on Norman Noble's infringing sales to Cordis. The district court granted Spectralytics' motion for a permanent injunction, an accounting, and pre- and post-judgment interest. The court denied the defendants' motions for a new trial, for judgment as a matter of law, or for remittitur. The court also denied Spectralytics' motion for enhanced damages and attorney fees based on the jury verdict of willful infringement.[FN1]

> FN1. *Spectralytics, Inc. v. Cordis Corp.,* 576 F.Supp.2d 1030 (D.Minn.2008); *Spectralytics, Inc. v. Cordis Corp.,* 650 F.Supp.2d 900 (D.Minn.2009).

Each side challenges rulings adverse to it, although the defendants do not appeal the judgment of infringement. We affirm on all aspects, except for the district court's application of the law of willful infringement. We vacate that portion of the judgment, and remand for reapplication of the law to the issues of enhanced damages and attorney fees.

BACKGROUND
Spectralytics manufactures medical devices, including the coronary stents that are the subject of the '277 patent. Norman Noble manufactures the coronary stents that were found to infringe the '277 patent, and provides these stents to the Cordis Corporation in accordance with an exclusive supply contract.

The patented stents are stainless steel tubes that are designed to be surgically inserted into an occluded artery and expanded in place, thereby opening the artery to blood flow. In order to expand the steel tube, the tube is cut into a pattern, described as "lace-like," that permits expansion and retention of shape after insertion into the artery. A laser metal-cutting device is used to manufacture such stents, whereby a laser beam cuts the desired pattern into the steel tube. Various machines had been designed for this use, but cardiac surgeons sought ever more complex stent patterns, requiring manufacturing techniques of extreme accuracy. The evidence at trial was that the Spectralytics device achieved a precision that was not achieved by the lasercutting machines then in use.

Previously, two producers of stents, LPL Systems and RMS Laser, had adapted a "Swiss-style" laser machine to the cutting of steel stents. A Swiss-style machine typically has a workpiece fixture that holds the workpiece in a cantilevered manner, and both the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 2307402 (C.A.Fed. (Mass.))
(Cite as: 2011 WL 2307402 (C.A.Fed. (Mass.)))

workpiece fixture and the laser cutting tool are rigidly mounted in order to suppress movement and vibration. Applying this machine to laser cutting of steel stents, LPL Systems and RMS Laser produced an improved stent. However, this machine still did not provide the pattern accuracy that was desired by surgeons, and in turn by Cordis as a supplier of medical devices.

Spectralytics undertook to develop improved stent products. Spectralytics started with a Swiss-style machine, but changed its structure in a manner that significantly increased the precision of the laser cut, and permitted more complex and versatile patterns. Unlike the prior Swissstyle machines, the Spectralytics machine was not based on suppressing vibration of the machine, but worked by essentially eliminating relative movement between the workpiece fixture and the cutting tool. The Spectralytics machine thus eliminated the deleterious effects of vibration by a design that ensured that if the laser tool and the workpiece did move or vibrate, they moved in precise unison. Spectralytics achieved this result by mounting the workpiece fixture directly on the laser cutting head so that it was "rigidly carried on" the cutting tool, as the '277 patent describes the apparatus. It was not disputed at trial that the Spectralytics '277 machine achieved improved precision and enabled more intricate pattern design as compared with prior steel stents.

*2 The '277 patent issued on December 22, 1998. Claim 1 is as follows:

1. An apparatus for manufacturing a hollow, generally tubular workpiece having a pattern cut around the circumference and along the length thereof, which comprises:

(a) a laser cutting tool, the laser cutting tool having means for generating a laser beam used as a cutting implement; and

(b) a workpiece fixture rigidly carried on the cutting tool in a fixed spatial arrangement during use of the fixture, the fixture having a cantilever support for supporting a piece of stock tubing beneath the laser cutting tool in a cantilever manner with the cantilever support being located on just one side of the laser beam with the tubing extending from the cantilever support past the laser beam and the tubing being unsupported on the other side of the laser beam, and wherein the workpiece fixture comprises:

(i) a fixture body secured to the cutting tool; and

(ii) a generally horizontal bushing carried on the fixture body and extending beneath the cutting tool, the bushing having a central bore which is sized to be slightly greater than an outside diameter of the stock tubing.

The testimony at trial included the following: both Spectralytics and Norman Noble were producers of coronary stents, and both hoped that Cordis would select it as the producer, for further provision by Cordis to users. In April of 1995 Spectralytics hired a sales representative named Jack Lundeen, who stated that he had close connections with key Cordis executives. Unbeknownst to Spectralytics, two months later, in June of 1995, Lundeen was also hired by Norman Noble.

By early August of 1995 the Spectralytics machine was designed and constructed and had been successfully shown to produce the desired precise complex designs in steel stents. Spectralytics and Norman Noble entered into a confidentiality agreement for the purpose of facilitating discussions of a possible business arrangement between the companies. On August 24, 1995 Larry and Scott Noble traveled to the Spectralytics plant in Minneapolis, for the stated purpose of learning about Spectralytics' laser stentcutting technology. Spectralytics' president, Gary Oberg, testified that he gave the Nobles a tour of the shop floor. Mr. Oberg testified that he did not recall all details of the visit, after ten years, but that Spectralytics' new laser cutting machine was on the shop floor, and there was no reason he would not have shown the machine to the Nobles when they toured the shop.

Norman Noble then built a Swiss-style stent cutting machine that had the workpiece fixture carried on the laser cutting tool. The stents produced by the new Noble machine were significantly improved over the stents previously produced by Noble, and Cordis entered into an exclusive supply contract with Noble. Cordis agreed to indemnify Noble for any patent infringement.

Spectralytics filed suit in July of 2005 against Cordis for patent infringement, and in August of 2006 Spectralytics added Norman Noble, Inc. as a defen-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 2307402 (C.A.Fed. (Mass.))
**(Cite as: 2011 WL 2307402 (C.A.Fed. (Mass.)))**

dant. Trial to a jury was held on the issues of validity, infringement, willful infringement of the '277 patent, and damages.

## VALIDITY

**\*3** We review the district court's decision on a motion for judgment as a matter of law by reapplying the district court's standard of review. *Sextant Avionique, S.A. v. Analog Devices, Inc.,* 172 F.3d 817, 824 (Fed.Cir.1999). In *Reeves v. Sanderson Plumbing Products., Inc.,* 530 U.S. 133, 150–51 (2000), the Court explained that a reviewing court must view the facts in the light most favorable to the prevailing party and must grant the benefit of all reasonable inferences to the party to whom the jury awarded the verdict. The Court explained that the reviewing court on JMOL must "give credence to the evidence favoring the nonmovant," and must "disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151. In discussing the jury role with respect to the issue of obviousness, the court stated in *Railroad Dynamics, Inc. v. A. Stucki Co.,* 727 F.2d 1506 (Fed.Cir.1984):

> [I]t is neither error nor dangerous to justice to submit legal issues to juries, *the submission being accompanied by appropriate instructions on the law from the trial judge.* The rules relating to interrogatories, jury instructions, motions for directed verdict, JNOV, and new trial, and the rules governing appeals following jury trials, are fully adequate to provide for interposition of the judge as guardian of the law at the proper point and when necessary.

727 F.2d at 1515. In *Tec Air, Inc. v. Denso Manufacturing Michigan, Inc.,* 192 F.3d 1353, 1357 (Fed.Cir.1999), this court reiterated that for a party to prevail on appeal of denial of JMOL "it must prove that the jury's factual findings were not supported by substantial evidence or that the facts were not sufficient to support the conclusions necessarily drawn by the jury on the way to its verdict." The applicable standard of the Eighth Circuit, in which this case arose, does not differ. *See, e.g., Jackson v. Prudential Ins. Co.,* 736 F.2d 450, 453 (8th Cir.1984) (JMOL "motions should not be granted if reasonable persons could differ as to the conclusions to be drawn from the evidence," and a trial court does not err when it denies a motion for JMOL if there is "substantial evidence—more than a mere scintilla of evidence—to

support a verdict in favor of the party opposing such a motion.").

As did the district court, we apply this standard to the issues raised on JMOL. Therefore, for Cordis to prevail it must establish that the jury's actual or inferred factual findings were not supported by substantial evidence, or that the evidence was not sufficient to support the findings and conclusions necessarily drawn by the jury on the way to its verdict. *See Applied Med. Res. Corp. v. United States Surgical Corp.,* 147 F.3d 1374, 1376 (Fed.Cir.1998).

The defendants argued at trial that it would have been obvious to change the Swiss-style machine into the structure that is the subject of the '277 patent. Witnesses testified for both sides, and the jury verdict was that the defendants did not prove that claim 1 of the '277 patent is invalid on the ground of obviousness. On motion for judgment as a matter of law, the district court discussed the evidence and concluded that the jury findings were supported by substantial evidence, that obviousness had not been proved by clear and convincing evidence, and that the jury verdict was not a miscarriage of justice. *Spectralytics,* 650 F.Supp.2d 900.

**\*4** The defendants argue that the district court abdicated its role as the ultimate decisionmaker, in relying on the presumed jury findings. The defendants point to the district court's statement that "if this case had been tried to the Court, the Court likely would have found the '277 patent invalid. But the Court cannot, on a post-trial motion, substitute its view of the evidence for the jury's." 650 F.Supp.2d at 905. We discern no error in the court's procedure for review of a jury verdict on the issue of obviousness where the underlying facts were disputed. "We first presume that the jury resolved the underlying factual disputes in favor of the verdict winner and leave those presumed findings undisturbed if they are supported by substantial evidence. Then we examine the legal conclusion *de novo* to see whether it is correct in light of the presumed jury fact findings." *Jurgens v. McKasy,* 927 F.2d 1552, 1557 (Fed.Cir.1991) (citations omitted).

The district court discussed the evidence before the jury, determined that the jury's presumed findings were supported by substantial evidence, and that such evidence supported the jury's conclusion that obviousness had not been proved. The defendants con-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 2307402 (C.A.Fed. (Mass.))
**(Cite as: 2011 WL 2307402 (C.A.Fed. (Mass.)))**

centrate their appeal on two prior art references, and assign error to the district court's comment that the jury could have found that the prior art and prior knowledge "taught away" from the '277 machine. The defendants also challenge the weight that may have been given to the objective factors including copying and commercial success.

The defendants argue that U.S. Patent No. 5,324,913 to Oberg and U.S. Patent No. 5,026,965 to Ohe render the Spectralytics machine obvious. The defendants state that these references teach attaching a fixture directly to a laser cutting tool. Spectralytics presented evidence at trial that in the Ohe machine the connection is not rigid, and in the Oberg machine the fixture is supported by the frame rather than the cutting tool. We agree with the district court that a reasonable jury could have credited Spectralytics' evidence as to these references.

There was expert testimony for both sides about the Swiss-style machines, and the district court discussed this evidence in its opinion on JMOL. 650 F.Supp.2d at 906. The experts generally agreed that laser metal-cutting machines had gone through several modifications, all of which failed to achieve the precision, yield, and complexity of cut that is achieved by the '277 design. There was testimony that in all of the prior modifications the designers kept the workpiece fixture firmly attached to the base of the machine. The Cordis expert on Swiss-style machines, Mr. Huber, testified that the machine of the '277 patent was "contrary to the accepted teachings of Swiss automatic screw machines." Trial Tr. 2105. Another Cordis witness, Jeff Miller, testified that when he first heard about the idea of carrying the workpiece fixture directly on the cutting tool he thought it was a "fantastic" idea.

**\*5** Spectralytics' expert, Mr. Madsen, testified that the prior Swiss-style machines taught away from the '277 design because the prior machines dealt with the problem of vibration by attempting to suppress or deaden vibration by fastening the entire apparatus to a cast iron support. Trial Tr. 2585 / 7, 2587 / 11. Mr. Madsen testified that, by contrast, the '277 design attaches the workpiece fixture to the laser cutting tool so that "if there is any vibration, they both move together because they are both attached." Trial Tr. 2586 / 7–8.

The defendants argue that the district court misapprehended the law of "teaching away," and erred in concluding that the jury could have found that the prior Swiss-style machines taught away from the '277 invention. The defendants cite cases where this court rejected assertions of "teaching away" on the ground that the prior art did not directly warn against the claimed invention or teach that the claimed invention would not work, *e.g., Baxter International, Inc. v. McGaw, Inc.,* 149 F.3d 1321, 1328 (Fed.Cir.1998) (finding no teaching away where nothing in the prior art device suggested that the claimed invention was unlikely to work); *In re Gurley,* 27 F.3d 551, 553 (Fed.Cir.1994) ("A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference or would be led in a direction divergent from the path that was taken by the applicant."). The defendants argue that nothing about the prior Swiss-style machines teaches that other designs should not or cannot be devised, or warns against mounting the workpiece fixture on the laser-cutting tool.

"Teaching away" does not require that the prior art foresaw the specific invention that was later made, and warned against taking that path. It is indeed of interest if the prior art warned against the very modification made by the patentee, but it is not the sole basis on which a trier of fact could find that the prior art led away from the direction taken by the patentee. Instead, the jury could find, based on the expert testimony, that prior Swiss-style machines taught away from embracing vibrations to improve cutting accuracy because all prior machines improved accuracy by dampening vibrations. <sup>FN2</sup> Nor is "teaching away" an essential element of a conclusion of unobviousness.

FN2. Cordis suggests that under *KSR International Co. v. Teleflex Inc.,* 550 U.S. 398, 421 (2007), it would have been obvious to try mounting the workpiece fixture on the cutting tool because there were only a finite number of predictable places to mount the fixture. That suggestion ignores the expert testimony indicating that the cutting tool was not a predictable place to mount the workpiece fixture.

Whether the prior art teaches away from the claimed invention is a question of fact, *Dystar Tex-*

*tilfarben GmbH v. C.H. Patrick Co., 464 F.3d 1356, 1360 (Fed.Cir.2006)*, and the district court took cognizance of the parties' arguments on this aspect. The court concluded that on the evidence presented "a reasonable jury could have found that the Swiss art taught away from attaching the workpiece fixture to the laser-cutting head as is done in the '277 patent," *650 F.Supp.2d at 906–07*, and explained that such a finding supported the verdict that obviousness had not been proved. We agree that the correct law was applied, and that an implicit finding of teaching away was supported by substantial evidence.

**\*6** The defendants also argue that the district court erred by failing to give appropriate weight to "admissions" by Spectralytics' technical expert. Mr. Madsen was asked whether attaching the fixture to the laser would be "just as obvious as attaching it to the shelf," if the only goal was to maintain a fixed spatial relationship between the fixture and the cutting tool. Mr. Madsen answered that "if you are just wanting to attach [the workpiece fixture], if that's your only concern, your only thought, you can attach it anywhere you want." Trial Tr. 2731–33. As the district court recognized, Mr. Madsen did not state that this "only thought" produced the '277 device. *Spectralytics, 650 F.Supp.2d at 906*. We discern no "admission" of obviousness.

Spectralytics points to the evidence of copying and commercial success. In *Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1538–39 (Fed.Cir.1983)*, this court observed that "evidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not. It is to be considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art." The objective considerations reflect the contemporary view of the invention by competitors and the marketplace. In *Iron Grip Barbell Co. v. USA Sports, Inc., 392 F.3d 1317, 1324 (Fed.Cir.2004)*, the court stated: "This court has previously identified, *inter alia,* commercial success, satisfaction of a long-felt need, and copying to be relevant factors." The jury could have considered this evidence, in deciding the question of obviousness. *See Comark Commc'ns. v. Harris Corp., 156 F.3d 1182, 1192 (Fed.Cir.1998)* ("It is not the province of an appellate court to second guess the jury's credibility determinations or to reevaluate the weight to be given

the evidence.").

Although the defendants argue that the requisite "nexus" was not established between the '277 device and commercial success, Spectralytics points to the evidence that Norman Noble stated that its new machine was the reason why its product was better than then-competing products, and that Cordis described the new Noble machine as "superior" and "advanced technology," with "cutting capabilities and precision not attainable" by the prior lasercutting system. There was substantial evidence whereby a reasonable jury could have found copying and commercial success, and could have weighed these factors in favor of nonobviousness. *See Pro–Mold & Tool Co. v. Great Lakes Plastics, Inc., 75 F.3d 1568, 1574 (Fed.Cir.1996)* (factual disputes concerning commercial success and copying are within the province of the trier of fact).

The district court recognized that "although the Court must review the conclusion of obviousness *de novo,* that conclusion depends on underlying factual findings that were the jury's to make." *Spectralytics, 650 F.Supp.2d at 906*. The district court did not "abdicate its role," but reviewed the evidence, applied the correct legal standard to findings that the court determined were supported by substantial evidence, and concluded: "Considering the evidence in the light most favorable to Spectralytics, as the Court must, the Court agrees with the jury that Cordis failed to carry its burden of showing by clear and convincing evidence that the '277 patent was obvious." *Id. at 907.* We discern no reversible error in this procedure, or in the court's analysis of the evidence, or in the court's ultimate conclusion based thereon.

DAMAGES

**\*7** The jury awarded damages at the rate of 5–percent of the sales price received by Norman Noble from Cordis for laser-cut stents made using the machine covered by the '277 patent. The defendants argue that the 5–percent royalty is excessive.

A party challenging a jury damages verdict "must show that the award is, in view of all the evidence, either so outrageously high or so outrageously low as to be unsupportable as an estimation of a reasonable royalty." *Rite–Hite Corp. v. Kelley Co., 56 F.3d 1538, 1554 (Fed.Cir.1995)* (en banc) (quoting *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

895 F.2d 1403, 1406 (Fed.Cir.1990)). As discussed in *Lucent Technologies, Inc., v. Gateway, Inc.,* "on post-trial JMOL motions, district court judges must scrutinize the evidence carefully to ensure that the 'substantial evidence' standard is satisfied, while keeping in mind that a reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty'." 580 F.3d 1301, 1336 (Fed.Cir.2009) (quoting *Unisplay, S.A. v. Am. Elec. Sign Co.,* 69 F.3d 512, 517 (Fed.Cir.1995)).

In the district court the defendants argued that there was insufficient evidence to support the jury's award of a 5–percent running royalty. However, in accordance with 35 U.S.C. § 284, the damages awarded should be "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the in-fringer." The jury was instructed that "a reasonable royalty is the amount of royalty that Spectralytics and Norman Noble would have agreed to in a hypothetical negotiation in December 1998, when the '277 Patent issued and the alleged infringement began." The jury was given a non-exhaustive list of eleven factors to consider, as follows:

(1) What royalties did Cordis, Norman Noble, or others pay for licenses to patents comparable to the '277 Patent?

(2) Did Spectralytics have a policy of licensing or not licensing the '277 Patent? What were the terms of those licenses?

(3) Was Spectralytics in competition with Cordis and/or Norman Noble?

(4) Does the ability to use the patented invention help in selling other products or services?

(5) How profitable was the patented device? Was it commercially successful or popular?

(6) What advantages and benefits did the patented invention provide over devices not claimed in the '277 Patent?

(7) Was an acceptable, non-infringing alternative available to Cordis and Norman Noble in December 1998, when the alleged infringement began?

(8) How extensively did Cordis and Norman Noble use the patented invention, and what was the value of that use to them?

(9) Is there a customary portion or percentage of the profit or selling price that is customarily paid in the field as a royalty for the use of patented inventions comparable to the invention claimed in the '277 Patent?

(10) What portion of profit is attributable to the patented invention versus other factors such as un-patented elements or unpatented manufacturing processes, or features or improvements developed by Cordis or Norman Noble?

**\*8** (11) What opinions do experts have as to what would be a reasonable royalty?

Trial Tr. 3056–58.

In deciding the motions for JMOL, the district court discussed the defendants' arguments. The de-fendants repeat on appeal that the royalty is much larger than the cost of switching to non-infringing alternatives. The defendants state that two acceptable non-infringing alternative machines were available: a modified version of the '277 machine that was made by Norman Noble in October 2008, and a modified version of a Comtal machine that was available in 1998. Spectralytics pointed out to the jury that Nor-man Noble's October 2008 machine was not made until ten years after the infringement began, and that it had not been used to cut production stents. As for the modified Comtal machine, the evidence was that Norman Noble had rejected this machine in 1998 because it was "not user friendly" and did not function correctly, and also that Cordis owned a modified Comtal machine but never used it.

The district court stated that the jury was not re-quired to accept the defendants' position that these alternative machines were available and acceptable, in light of the contrary evidence. *Spectralytics,* 650 F.Supp.2d at 907. A fact finder "must proceed with caution in assessing proof of the availability of sub-stitutes not actually sold during the period of in-fringement." *Grain Processing Corp. v. Am. Ma-ize–Prods. Co.,* 185 F.3d 1341, 1353 (Fed.Cir.1999).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 2307402 (C.A.Fed. (Mass.))
**(Cite as: 2011 WL 2307402 (C.A.Fed. (Mass.)))**

We agree with the district court that a reasonable jury could have found that the alleged alternatives were either not acceptable or not available, and that such a finding was supported by substantial evidence.

The defendants also argue that the jury may have based the 5–percent royalty rate on the 5–percent sales commission paid to Jack Lundeen by Norman Noble, and that Mr. Lundeen's sales commission is not related to any of the standard measures of infringement damages. As the district court observed "Cordis does not really know if the jury based its award on Lundeen's commission," and the "fact that Lundeen's commission was five percent did not somehow put the number five off limits to the jury." *Spectralytics,* 650 F.Supp.2d at 919. Moreover, the commission paid to Lundeen was not irrelevant to a hypothetical negotiation between Spectralytics and Norman Noble because it shed light on what Norman Noble was willing to pay to procure a business relationship with Cordis.

Spectralytics' expert, Ms. Davis, testified that the hypothetical negotiations favored a 20–percent royalty, based on the factors set out in *Georgia–Pacific Corp. v. United States Plywood Corp.,* 318 F.Supp. 1116, 1120 (S.D.N.Y.1970), and as reflected in the jury instructions *ante.* The evidence was that Spectralytics had never licensed a competitor under relevant patents, and that at the time of the hypothetical negotiation Spectralytics and Norman Noble were direct competitors in the market for metal stents. It was not disputed that the product of the machine of the '277 patent was superior to prior products, that for the six year period Norman Noble had approximately $447,000,000 in sales to Cordis for stents made with the infringing machine, and that Noble's profit margin was about 67–percent. There was also testimony that Cordis would have played a role in the hypothetical license negotiation in view of its agreement to indemnify Noble for patent infringement.

**\*9** The defendants suggested a low lump sum payment, and apparently did not suggest any royalty rate. We agree with the district court that the jury's choice of a 5–percent royalty was not "outrageously high" in view of the expert testimony that 20–percent was reasonable and appropriate in light of trade practices and the economic and competitive circumstances.

The defendants also argue that Spectralytics placed a low value on its invention, because in 2004 Spectralytics sold its assets for $4 million plus a contingent 25–percent of any recovery for patent infringement. The district court found that the jury could reasonably have concluded that this pricing arrangement had little relevance to a reasonable royalty. We agree with the district court that this circumstance does not render a 5–percent royalty unreasonable, for, as the district court explained, Spectralytics "hoped that the patent would survive any challenge to its validity, but Spectralytics did not really know for certain, and it could not really know for certain without paying millions of dollars in legal fees to launch lengthy and risky litigation. Thus, the value assigned to the '277 patent in 2003 would have reflected a very deep discount." 650 F.Supp.2d at 916. The district court observed that the weight to be given to this aspect "was a task for the jury, and a reasonable jury could have chosen to give very little weight to this evidence." *Id.*

Spectralytics' economics expert had testified that a 20–percent royalty was appropriate, but Spectralytics does not appeal the jury's 5–percent royalty rate. The jury was entitled to choose a damages award within the amounts advocated by the opposing parties. *See Fuji Photo Film Co. v. Jazz Photo Corp.,* 394 F.3d 1368, 1378 (Fed.Cir.2005) ("the jury is not bound to accept a rate proffered by one party's expert but rather may choose an intermediate royalty rate."). The jury's assessment was neither outrageously high nor outrageously low. *See Rite–Hite,* 56 F.3d at 1554.

We agree with the district court that the 5–percent royalty awarded by the jury was supported by substantial evidence in the record as a whole. *See Unisplay,* 69 F.3d at 519 ("a jury's [royalty] choice simply must be within the range encompassed by the record as a whole").

## WILLFUL INFRINGEMENT

The jury found that the infringement was willful. Spectralytics appeals from the district court's denial of Spectralytics' request for enhanced damages and attorney fees, stating that the district court misapplied the law, and thus abused its discretion.

The district court's decision on whether to enhance damages is reviewed for abuse of discretion, that is, whether the decision was based on clearly

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

erroneous findings of fact, an incorrect conclusion of law, or a clear error of judgment. *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc., 127 F.3d 1462, 1469 (Fed.Cir.1997)*. We observe that the district court applied our decision in *In re Seagate Technology, LLC, 497 F.3d 1360 (Fed.Cir.2007)* (en banc), in a more rigorous manner than is appropriate, as has been elaborated in intervening decisions. The district court also applied the *Seagate* criteria for determining whether infringement is willful, to the separate determination of whether to enhance damages after willful infringement is found. Recent precedent has clarified that the factors relevant to these determinations are not coextensive.

**\*10** In *Seagate* this court held that failure to exercise due care by obtaining an exculpatory opinion of counsel before commencing infringing activity is not of itself probative of willful infringement; the court held that there must be "objective recklessness," before failure to obtain an exculpatory opinion of counsel can establish willful infringement. *Id.* at 1371. However, the court did not hold that after willful infringement is established, it is improper to consider whether the infringer exercised adequate investigation of any adverse patents. This distinction was clarified in *i4i v. Microsoft,* where this court explained that "the test for willfulness is distinct and separate from the factors guiding a district court's discretion regarding enhanced damages." *i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 859 (Fed.Cir.2010), cert. granted on other grounds, 131 S.Ct. 647 (2010).*

Precedent has also clarified that the failure to obtain an opinion of counsel or otherwise investigate the patent situation can be considered, in the totality of the circumstances. *See Aspex Eyewear, Inc. v. Clariti Eyewear, Inc., 605 F.3d 1305, 1313 (Fed.Cir.2010)* ("the timing as well as the content of an opinion of counsel may be relevant to the issue of willful infringement, for timely consultation with counsel may be evidence that an infringer did not engage in objectively reckless behavior") (citing *Finisar Corp. v. DirecTV Group, Inc., 523 F.3d 1323, 1339 (Fed.Cir.2008)*). In *i4i* this court sustained the district court's enhancement of damages, because "Microsoft was aware of i4i's patent, never formed a good faith belief of noninfringement, and clearly intended to add a custom XML editor in Word with similar capabilities to i4i's patented products." *598 F.3d at 858*. Although Microsoft had presented the same argument as here offered, *viz.* that *Seagate* abrogated the duty to investigate previously placed upon those with knowledge of an adverse patent, this court held that the district court could and should consider whether infringement had been investigated, explaining: "Although a finding of willfulness is a prerequisite for enhancing damages under § 284, the standard for deciding whether—and by how much—to enhance damages is set forth in *Read,* not *Seagate* .... Under the *Read* factors, the district court properly considered ... whether Microsoft investigated the scope of the patent." *i4i, 598 F.3d at 859*.

In *Read Corp. v. Portec, Inc., 970 F.2d 816 (Fed.Cir.1992)*, the court identified factors that may be relevant to determination of whether damages should be enhanced: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent, investigated the patent and formed a good faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior in the litigation; (4) the infringer's size and financial condition; (5) the closeness of the case; (6) the duration of the misconduct; (7) the remedial action by the infringer; (8) the infringer's motivation for harm; and (9) whether the infringer attempted to conceal its misconduct. *Id. at 826–27.* Thus although the district court was correct in holding that a finding of willful infringement may not warrant enhancement of damages, nonetheless, after willful infringement is found, it is inappropriate to discount evidence relating to whether there was adequate investigation of adverse patent rights. That is only one of the *Read* factors, but *Seagate* did not hold that it should be ignored.

**\*11** Applying the *Read* factors, the district court found that "[m]ost of these factors weigh against, or are neutral toward, a finding of enhanced damages in this case." *Spectralytics, 650 F.Supp.2d at 922*. The district court stated that "after *Seagate,* greater emphasis must be placed on objective factors in assessing the degree of a defendant's willfulness." *Id.* The district court remarked that the jury was not asked for a specific finding as to whether Noble copied the Spectralytics machine. Spectralytics argues that the jury verdict of willful infringement necessarily was based on a finding of copying. The district court stated: "With respect to defendants' investigation, the Court finds that Cordis did not carefully investigate the '277 patent until trial, but the Court discounts this factor in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 2307402 (C.A.Fed. (Mass.))
**(Cite as: 2011 WL 2307402 (C.A.Fed. (Mass.)))**

light of *Seagate's* abrogation of the duty of due care." *Id.*

*Seagate* removed the presumption of willful infringement flowing from an infringer's failure to exercise due care to avoid infringement, but *Seagate* did not change the application of the *Read* factors with respect to enhancement of damages when willful infringement under § 285 is found. We thus vacate the district court's denial of enhanced damages, and remand to the district court to redetermine whether enhanced damages are warranted under the guidance of *Read,* 970 F.2d at 826, that the "paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances."

## ATTORNEY FEES

The patent statute provides that "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. Although an attorney fee award is not mandatory when willful infringement has been found, precedent establishes that the court should explain its decision not to award attorney fees. *Transclean Corp. v. Bridgewood Servs., Inc.,* 290 F.3d 1364, 1379 (Fed.Cir.2002) ("[T]he general rule [is] that the district court must normally explain why it decides that a case is not exceptional under 35 U.S.C. § 285 when a factual finding of willful infringement has been established and, if exceptional, why it decides not to award attorney fees."); *Modine Mfg. Co. v. Allen Group, Inc.,* 917 F.2d 538, 543 (Fed.Cir.1990) ( "[W]hen a trial court denies attorney fees in spite of a finding of willful infringement, the court must explain why the case is *not* 'exceptional' within the meaning of the statute.").

Here, the district court did not separately analyze the attorney fee issue, but denied attorney fees in conjunction with denial of enhanced damages. Indeed, similar considerations may be relevant to both enhanced damages and attorney fees. *See Transclean,* 290 F.3d at 1379 ("In this case, the court's careful analysis of the *Read* factors regarding enhancement of damages suffices as grounds for affirming the court's implicit conclusion that the infringement case was not exceptional within the meaning of 35 U.S.C. § 285."). However, the situations in which § 284 and § 285 may be invoked are not identical. For example, attorney misconduct or other aggravation of the litigation process may weigh heavily with respect to attorney fees, but not for enhancement of damages.

**\*12** We take note of the district court's remark that both sides did not exhibit immaculate trial behavior. However, in view of our remand for redetermination of enhancement of damages, reconsideration of the request for attorney fees is also warranted.

## CONCLUSION

The judgment of validity, infringement, and the royalty rate for measurement of damages is affirmed. The denial of enhanced damages and attorney fees is vacated, and the case is remanded for redetermination of these issues, as well as other steps appropriate to completion of this litigation.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED**

C.A.Fed. (Mass.),2011.
Spectralytics, Inc. v. Cordis Corp
--- F.3d ----, 2011 WL 2307402 (C.A.Fed. (Mass.))

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.